**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

1

2

3 _____

**SANDOZ, INC., RAREGEN, LLC,**      **CIVIL ACTION NUMBER:**
4
    **Plaintiffs,**              **3:19-cv-10170-BRM-LHG**
5
    **v.**                        **PRELIMINARY INJUNCTION**
6                                   **HEARING**
**UNITED THERAPEUTICS**
7 **CORPORATION, SMITHS MEDICAL**
**ASD, INC.,**
8
    **Defendants.**
9 _____
    Martin Luther King Building & U.S. Courthouse
10     50 Walnut Street, Newark, New Jersey 07101
    Tuesday, December 10, 2019
11     Commencing at 10:50 a.m.

12 **B E F O R E:**              **THE HONORABLE BRIAN R. MARTINOTTI,**
                                      **UNITED STATES DISTRICT JUDGE**
13

14 **A P P E A R A N C E S:**

15     ALSTON & BIRD, LLP
    BY:  JENNY R. KRAMER, ESQUIRE
16     90 Park Avenue
    New York, NY  10016
17     For the Plaintiff Sandoz, Inc.

18     ALSTON & BIRD, LLP
    BY:  MATTHEW D. KENT, ESQUIRE
19     One Atlantic Center
    1201 West Peachtree Street
20     Atlanta, GA   30309
    For the Plaintiff Sandoz, Inc.

21

22

23     Megan McKay-Soule, Official Court Reporter
                  megansoule430@gmail.com
24               (215) 779-6437

25 Proceedings recorded by mechanical stenography; transcript
      produced by computer-aided transcription.

```
 1   APPEARANCES CONT'D

 2        QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
          BY: ETHAN GLASS, ESQUIRE
 3            THOMAS D. PEASE, ESQUIRE
              PETER CALAMARI, ESQUIRE
 4            MIKE BONANNO, ESQUIRE
          51 Madison Avenue
 5        New York, NY  10010
          For the Plaintiff Raregen, LLC
 6
          WILLIAMS & CONNOLLY, LLP
 7        BY:  JONATHAN B. PITT, ESQUIRE
               CHRISTOPHER T. BERG, ESQUIRE
 8             EDWARD BENNETT, ESQUIRE
               SEAN M. DOUGLASS, ESQUIRE
 9        725 Twelfth Street NW
          Washington, DC 20005
10        For the Defendant United Therapeutics Corporation

11        BLANK ROME, LLP
          BY:  STEPHEN ORLOFSKY, ESQUIRE
12             MICHAEL DARBEE, ESQUIRE
               ADRIENNE C. ROGOVE, ESQUIRE
13        300 Carnegie Center, Suite 220
          Princeton, NJ  08540
14        For the Defendant United Therapeutics

15
          KILPATRICK TOWNSEND & STOCKTON
16        BY:  PETER M. BOYLE, ESQUIRE
               GRETCHEN RANDALL, ESQUIRE
17             MEGHAN HANSEN, ESQUIRE
               CHRISTINA E. FAHMY, ESQUIRE
18             FREDERICK L. WHITMER, ESQUIRE
          607 14th Street, NW, Suite 900
19        Washington, DC  20005
          For the Defendant Smiths Medical, ASD, Inc.
20

21

22

23

24

25
```

1          (PROCEEDINGS held in open court before The Honorable
2   BRIAN R. MARTINOTTI, United States District Judge, on December
3   10, 2019, at 10:50 a.m.)
4          THE COURT:  Welcome everyone.  Good morning.  First,
5   thank you for accommodating the venue change.  Much
6   appreciated.
7       Before we get started, would conversation help?
8          MR. GLASS:  Yes, Your Honor.
9          THE COURT:  Can you pick two a side to come in
10  chambers?
11         MR. KENT:  Your Honor, would you like outside
12  counsel?
13         THE COURT:  Two lawyers on each side.  Can we do
14  that?
15         MR. BENNETT:  Of course, Your Honor.
16         (A short recess occurred.)
17         THE COURT:  Good morning again, counsel.
18      We did have a quick conversation in chambers.  It does
19  not appear at this point we are going to be able to make any
20  progress.  That being said, I did put a text order on the
21  docket indicating you have a half hour each for your arguments
22  with 15 minutes.  You can use your time putting your
23  appearances on the record or we can just go.  Anyway, go
24  ahead.  Appearances for the record, please.  I was teasing.
25  You could all be seated.

1       MR. GLASS:  Thank you, Your Honor.  On behalf of

2   RareGen, my name is Ethan Glass.  With me at counsel table is

3   Thomas Pease and Mike Bonanno.  Also, Peter Calamari is here

4   on behalf of RareGen with the clients.

5       THE COURT:  Thank you.

6       MR. KENT:  Good morning, Your Honor.  Matthew Kent

7   from Alston & Bird on behalf of plaintiff Sandoz, Inc.  And

8   I'm joined today by Ms. Kramer, Ms. Thompson, and Mr. Parente

9   also of Alston & Bird.  And I have two client representatives

10   also present.

11       MR. ORLOFSKY:  Good morning, Your Honor.  Stephen

12   Orlofsky, Blank Rome, LLP, on behalf of United Therapeutics

13   Corporation.  With me today, Your Honor, are my colleagues

14   from Williams & Connolly, Jonathan Pitt, Edward Bennett, Sean

15   Douglass, and Christopher Berg.  Also of Blank Rome, Adrienne

16   Rogove and Michael Darbee.

17       THE COURT:  Thank you.

18       MR. BOYLE:  Your Honor, Peter Boyle for Smiths

19   Medical ASD.  With me today are my partners Fred Whitmer and

20   Christina Fahmy.  We also have here in the courtroom Gretchen

21   Randall who is general counsel of Smiths Medical and Meghan

22   Hansen who is associate general counsel.

23       THE COURT:  Okay.

24       Counsel.

25       MR. GLASS:  Your Honor, may I take my cell phone to

1  keep track of time?

2       THE COURT:  Sure.

3       MR. GLASS:  Your Honor, may I also approach?  We have

4  copies of our slides.

5       THE COURT:  Okay.

6       MR. GLASS:  Your Honor, again, Ethan Glass on behalf

7  of plaintiff RareGen.

8       Your Honor, we're not going to present the slides on

9  the screen.  We are not as technologically capable as the

10  other parties.

11       THE COURT:  Okay.

12       MR. GLASS:  But we have provided copies of the slides

13  to the defendants.

14       Your Honor, we have also talked with the defendants

15  about confidentiality, and we have come to an agreement that

16  the slides that we're showing today and the evidence presented

17  may be presented in open court, and it may be provided to

18  everybody's client with the exception being any numbers

19  relating to price.

20       THE COURT:  Okay.

21       MR. GLASS:  So we're not going to orally state the

22  numbers, but I will point you -- if I have a number I want to

23  show you -- in the slides.

24       THE COURT:  Okay.

25       MR. GLASS:  Thank you, Your Honor.

1          THE COURT:  That's agreed by both sides?

2          MR. BENNETT:  Yes, Your Honor.  With the addition of

3    talking about patient population size.

4          THE COURT:  Okay.

5          MR. GLASS:  Your Honor, as we stated in our brief,

6    and as the defendants have failed to contest --

7          THE COURT:  Where is the irreparable harm to your

8    clients as we stand here today?

9          MR. GLASS:  Thank you, Your Honor.

10         Your Honor, there has been irreparable harm to date,

11   but there would also be irreparable harm going forward.  So

12   the irreparable harm going forward, which would be remedied by

13   a preliminary injunction, is the harm to our client's

14   goodwill.  It's the harm --

15         THE COURT:  How?

16         MR. GLASS:  Because the way that generic supply works

17   is that the purchasers were -- for this drug is only two

18   pharmacies, CVS and Accredo.  The purchasers are desperately

19   focused on supply guarantee.  So the number one consideration

20   when you're selling a generic is that you can --

21         THE COURT:  You can supply all the drugs that they

22   need.  The problem is delivering it to a patient --

23         MR. GLASS:  Correct, Your Honor.

24         THE COURT:  -- which is out of your control.  It's

25   not like your factory can't produce the drug.

1    MR. GLASS:  That's correct, Your Honor.

2    THE COURT:  Okay.  How does that transcend into your

3  reputation?

4    MR. GLASS:  So our reputation is hurt because we have

5  gone on to market with the drug that we can make.

6    THE COURT:  Right.

7    MR. GLASS:  We approached both specialty pharmacies

8  in late 2018 to have supply contracts.  In those discussions,

9  the specialty pharmacies told us that all we needed was the

10  drugs.  They had pumps.  They had cartridges.  We told them we

11  were going to be able to solve the drug issue for them.  They

12  told us they had pumps and cartridges available.

13    THE COURT:  Right.

14    MR. GLASS:  Then --

15    THE COURT:  Through no fault of you or your client,

16  there's no cartridges and pumps.

17    MR. GLASS:  That's right.  And so the problem now is

18  that these specialty pharmacies, whether it's our fault or

19  not --

20    THE COURT:  Right.

21    MR. GLASS:  -- are skeptical that we're going to be

22  able to deliver on our promises to make the drug available.

23    THE COURT:  Well, how can you say that when part of

24  your papers talk about the fact that the defendants really put

25  pressure on these pharmacies to exclude you from the market?

1  And then they're going to turn around and say you can't

2  produce for us when they were complicit in this, perhaps?

3           MR. GLASS:  Yes, Your Honor.  Because they'll make

4  the same arguments to the specialty pharmacies that they've

5  made to Your Honor, which is that we should have anticipated

6  the anticompetitive conduct.  We should have had pumps and

7  cartridges arranged before we launched, and because we didn't

8  it's our fault.  And then it's just a debate with the

9  specialty pharmacies.  On one hand, we've got the defendants

10 telling the specialty pharmacies it's our fault.  On the other

11 hand, we're telling the specialty pharmacies it's their fault.

12 All the while the defendants are supplying both pumps and

13 cartridges.

14          THE COURT:  But the specialty pharmacy says to you we

15 just need your product.  We have a method of delivery.  And

16 then they say to you we don't have a method of delivery

17 anymore because of what they did.  You should have thought

18 about this the same way they did, to arrange this arrangement

19 or to get into this arrangement, and that's your fault, even

20 though we, the pharmacy, said we had a method of delivery?

21          MR. GLASS:  So there's two other parties involved in

22 this.

23          THE COURT:  Okay.

24          MR. GLASS:  I don't want them to get lost.

25          THE COURT:  Okay.

```
 1          MR. GLASS:  We've got prescribers and we've got

 2   patients.

 3          THE COURT:  Right.

 4          MR. GLASS:  That's in addition to the specialty

 5   pharmacies.  So even if we are able to persuade the specialty

 6   pharmacies that it's their fault, while they're telling us

 7   it's our -- they're telling the specialty pharmacies it's our

 8   fault.  We need prescribers to prescribe the generic.  We need

 9   payers to put on their formularies the generic, and we need

10   patients to not push back on the prescribers about the

11   generic.  And those are all parties that have no idea that

12   there was this scheme.

13          THE COURT:  Are they part of this lawsuit?

14          MR. GLASS:  No, they're not part of this lawsuit.

15          THE COURT:  So I come back to how's this harming you,

16   aside from the fact that your company isn't able to sell the

17   product and receive money for your product?

18          MR. GLASS:  Because -- let me give you an example.

19   If we receive the injunction today and we had access to

20   cartridges, that would solve our cartridge problem.  But we

21   would need to go to the prescribers and explain to them what

22   has happened over the past nine months since they thought we

23   were going to be able to launch but couldn't.

24          THE COURT:  Does a prescriber actually write a

25   prescription for a generic, or does a prescriber write the
```

1    prescription and then you go to the pharmacy and the pharmacy

2    says we have the generic, or you get into an intermediary that

3    says, you know, the generic is X, the branded is X to the

4    second power?

5           MR. GLASS:  This is why the payers, the insurance

6    companies are important because it starts with them.  The

7    payers have a formulary which are the drugs that are covered

8    by their insurance policies.  The payers will require

9    mandatory substitution for certain drugs meaning that when you

10   or I go to the pharmacy to fill our prescription, the pharmacy

11   will have to substitute to the generic, regardless of how the

12   prescription is written.

13          THE COURT:  Okay.

14          MR. GLASS:  The doctors can check a little box called

15   "dispense as written" to override that.  And so what we need

16   is we need everybody in this ecosystem to understand that we

17   have secure supply.  We need the insurers to put us on their

18   formulary, which they have not because we are unable to launch

19   in subcutaneous.  We need the insurers to say that there's

20   mandatory substitution, which they will only do if there's

21   insured supply.  We need the doctors to not check "dispensed

22   as written," and we need the specialty pharmacies to actually

23   stock and dispense.

24          The problem with the theory that the specialty

25   pharmacies know what's going on is that they're only one piece

1    of the entire puzzle, and that's irreparable injury because

2    but for the unlawful restraints, we would have launched and

3    everybody in the ecosystem would have been able to test our

4    product, see whether or not it should be on formularies, see

5    whether or not doctors want to prescribe it or mark it

6    "dispense as written."  But now, nine months later, there's

7    been a significant diminution of our good will.  And we can

8    regularly interact with the prescribers.  We have day-to-day

9    meetings with the prescribers so that they don't check

10   "dispense as written."  We meet with the insurers so they put

11   us on their formulary.  And so that's been a significant

12   irreparable injury.  That continues on.  And what we know is

13   that at some point there's a tipping point.  At some point the

14   prescribers and the insurers and the specialty pharmacies and

15   the patients give up on the generic supplier.  And so our

16   concern is that that tipping point is in the near future

17   where even if we got access to cartridges, they will have

18   written us off.  And we have a good example of that.  Another

19   PAH drug, which uses a different approach called Flolan --

20           THE COURT:  That was a manufacturing issue, wasn't

21   it?

22           MR. GLASS:  It was, but the problem is --

23           THE COURT:  It was their manufacturing plant.

24           MR. GLASS:  But the patients and the prescribers --

25           THE COURT:  But it was their own fault.  I mean, this

 1  is -- there's a third party -- I'm saying it, but I don't mean

 2  it -- to blame here.

 3          MR. GLASS:  There is but nobody knows that.  This has

 4  all been confidential.  The reason we asked for discovery from

 5  Your Honor is because we approached the specialty pharmacies

 6  and they told us no problem.  We started talking with them

 7  about contracts.  Then all of a sudden they told us, actually,

 8  we can't stock you.  That's the only interaction that alerted

 9  us to this conduct.  Everything has been secret.  There's been

10  nothing that's been publicly announced.  Nothing made public

11  through this litigation.  There's a protective order, and so

12  if we go and we tell the insurers and the payers and the

13  patients actually it was their fault, they're going to say, we

14  don't know that.  There's no evidence of that.

15      And that's the core problem with our irreparable injury

16  is that every day that goes by, they win.  Because not only do

17  they get the millions of dollars of overpayments by patients,

18  but they also reduce incrementally the prospect that we will

19  succeed.

20          THE COURT:  So let me ask you the question, which

21  really is looming.  How come, when they knew what was going to

22  happen in 2015, and they reacted, how come your client didn't

23  react the same way or act as quick?

24          MR. GLASS:  So Mr. Kent will speak specifically to

25  the Sandoz issues.  But I'll tell you, Your Honor, that we

1   didn't know that they were going to corner the market on

2   cartridges.  In fact, from my client's perspective, RareGen's

3   perspective, we were talking to the specialty pharmacies in

4   late 2018, and there was no such restriction.  What defendants

5   like to cite is an end-of-life notice for the pump.  This

6   isn't a pump case.  We're not here to talk about the pumps.

7   We understood that the pumps that were in Accredo's possession

8   were owned by Accredo and available to use with whoever

9   Accredo dispensed it with.

10          So the idea that 2015 and 2016 we had any notice is

11   fiction.  The first we learned of it, the first we learned of

12   it, the first we learned of it was when Accredo and CVS

13   changed abruptly in late 2018, and said, we can no longer talk

14   with you about stocking your drug.  That's when we said, oh,

15   my gosh, something has changed in the market.  We approached

16   UT and Smiths to try to resolve this, and then we sued in

17   April.  So there was no delay and there was diligence.

18          We also, Your Honor, right when we heard that there was

19   an issue, started working on alternatives.  So we were

20   reaching out to alternative pump suppliers.  We were reaching

21   out to alternative cartridge suppliers.  We wouldn't be here

22   today if we had an alternative pump or cartridge to offer the

23   market.

24          THE COURT:  And you're still pursuing that avenue?

25          MR. GLASS:  We're still pursuing that, Your Honor, to

1   this day.  We have a third party who we're working with that

2   we expect will be able to make cartridges for us eventually,

3   but we don't have any cartridges today and there's no imminent

4   cartridge launch.

5          Your Honor, one more thing on irreparable injury, if I

6   may, and then I'll be happy to answer any more questions Your

7   Honor has.

8          We had a 180-day exclusivity period.  The 180

9   exclusivity period is statutorily granted to the first ANDA

10  filer.  I'm sure Your Honor has had Hatch-Waxan cases and

11  knows that when the party who challenges the patent prevails

12  in court, that party gets 180-day exclusivity.  We got that on

13  a -- based on a settlement.

14          THE COURT:  Right.

15          MR. GLASS:  Your Honor --

16          THE COURT:  So you're saying they entered that

17  settlement with unclean hands because they knew,

18  notwithstanding what the agreement was when you were going to

19  go to launch, you couldn't launch because there was no way to

20  deliver your product?

21          MR. GLASS:  So from my third-party perspective

22  because RareGen was not a party to that, yes.  I'll let Sandoz

23  specifically discuss what Sandoz expected.  But when I look at

24  that contract and the contract says you may launch on this

25  date, but they knew that when we got close to launching that

1    they were going to incumber our launch by making the

2    cartridges unavailable, that is not good faith, Your Honor.

3         And Your Honor, that just goes back to there isn't a

4    lack of diligence.  Sandoz could reasonably expect that if

5    there was a contractual provision that said that it could

6    launch, that there wouldn't be any impediments placed by the

7    parties to that settlement agreement.

8         And Your Honor, the 180-day exclusivity period has

9    expired.  It started and it has expired.  That's irreparable

10   injury because the way generics also work is that the 180

11   exclusivity grantee, the party that has the right to be the

12   exclusive generic, almost always has an advantage over the

13   other generics.  Because like the brand, being able to get in

14   with the doctors, get in with the insurance companies, get in

15   with the specialty pharmacies and get in with the patients,

16   there's a reluctance to switch.  And that is gone.  We will

17   never get that back.

18        So that's an irreparable injury that continues for us,

19   in addition to the incrementally diminishing possibility that

20   we can even succeed.

21        THE COURT:  I took you off track.  I probably got to

22   some of what you wanted to talk about.

23        MR. GLASS:  For sure, Your Honor.

24        THE COURT:  Okay.

25        MR. GLASS:  So, Your Honor, just to conclude about

1    the non-likelihood of success factors.  So RareGen and Sandoz

2    are suffering monetary damages.  That we don't dispute.  But

3    we also have this irreparable injury component that has

4    happened and continues.

5           On the other hand, if the injunction is granted, there

6    is no irreparable injury to the defendants.  So when we're

7    talking about an injunction, we're looking at the but-for

8    world.  The but-for world is Your Honor grants the injunction,

9    they just have to compete.  They have to provide better

10   quality products and lower prices to keep us from gaining

11   their customers.  That can't be irreparable injury.  That

12   can't be injury at all.  That's a benefit.

13          THE COURT:  Well, what is the status of these pumps

14   and cartridges right now?  Who owns them?

15          MR. GLASS:  So, Your Honor, it depends on which pumps

16   you're talking about.

17          THE COURT:  Right.

18          MR. GLASS:  So for pumps, our understanding is

19   Accredo, the largest specialty pharmacy, which has a

20   significant portion of the patients that it cares for, has

21   enough pumps to service all of its patients.  Those pumps are

22   unencumbered by defendants.  So those are the pumps that we

23   would use with Accredo's permission to the patients who are

24   using the generic treprostinil.

25          THE COURT:  Absent the agreement.

```
 1              MR. GLASS:  Absent the agreement.
 2              THE COURT:  Okay.
 3              MR. GLASS:  There are also pumps that are under
 4    defendant's control, which we're not talking about in our
 5    case.  We're not talking about here.
 6              THE COURT:  They own or they control.
 7              MR. GLASS:  That they control them and they can use
 8    them, and we're not asking for the injunction to apply to
 9    those pumps.
10              THE COURT:  Okay.
11              MR. GLASS:  Cartridges, the way that cartridges
12    worked before the restraints was that a specialty pharmacy
13    would place an order to Smiths to purchase cartridges.  That
14    order would then be filled, no questions.  Just you need 2,000
15    cartridges, we're going to fill them.
16         Now, the way that the cartridge supply works, is that
17    specialty pharmacies places an order with UTC, and UTC makes
18    sure that the specialty pharmacies are not using those
19    cartridges for a generic.  Once UTC is comfortable that the
20    specialty pharmacies are only using it for Remodulin®, then
21    UTC will sell them the cartridges.
22              THE COURT:  Who owns those cartridges?
23              MR. GLASS:  UTC does.
24              THE COURT:  And how about if UTC says we'll sell you
25    these cartridges, but as double what the market price has?
```

1       MR. GLASS:  Your Honor, I don't want to speak for my

2   clients, but I'm sure they would take that.  I -- I have no

3   doubt that my client would buy cartridges from UTC at a hefty

4   premium to what UTC paid for them.

5       Your Honor, again, I haven't consulted with my client.

6       THE COURT:  You want to go back in the conference

7   room?

8       MR. GLASS:  I mean, Your Honor, it shows you how

9   important the cartridges are.  I don't want to negotiate for

10  my client, but I'm not sure there's any number you can tell me

11  today that I wouldn't take back to my client and we would have

12  a very serious discussion of paying that.

13      Now, Your Honor, the balance of harms and important

14  part -- and this goes to irreparable injury in a very unique

15  way for this case.  There is an irreparable injury to the

16  public as well.  So this normally goes under the public

17  interest prong.  The public interest prong is normally a

18  throwaway in preliminary injunction cases that's tacked on to

19  the end.  Here, the public interest prong is paramount.  The

20  public interest is in having access to all of the competing

21  drugs.  That is undisputable.  The public has an interest in

22  being able to choose between the Remodulin® product and

23  plaintiff's generic product.  The public has an interest in

24  the competition that the generic product brings to Remodulin®.

25      THE COURT:  Well, the public interest isn't that they

1   can't get the drug because clearly there are -- they're

2   getting the drug, albeit at a higher cost, perhaps.  And there

3   are three other methods that they can get the drug, albeit not

4   the preferred method of having the drug administered, correct?

5           MR. GLASS:  Respectfully, Your Honor, no.

6           THE COURT:  Okay.  Tell me why.

7           MR. GLASS:  Let me start with, yes, patients can get

8   access to Remodulin®.  There is no dispute that patients can,

9   at a 98 percent margin.

10           THE COURT:  Okay.

11           MR. GLASS:  So in the annual report -- if Your Honor

12   will please turn to slide 12.  In UTC's annual report, it

13   states exactly how much revenue and profit it gets from

14   Remodulin®.  $599,000,000 in revenue on 584.9 million in

15   profit.

16           THE COURT:  Okay.

17           MR. GLASS:  What would happen is patients and payers

18   would significantly benefit from the entry of a generic

19   because that gross profit number, even if Remodulin® kept all

20   100 percent of its patients, would go down.

21       How do we know that?  Because on slides 13 and 14, we

22   have evidence from discovery on what the response was by the

23   mooted, just the mere threat of RareGen and Sandoz entering.

24   So this is the part where we've agreed with the defendants not

25   to say in open court.

1          THE COURT:  Okay.

2          MR. GLASS:  But you can see from this testimony, this

3     is the president of UTC.  The president of UTC testified that

4     they increased price in 2018, and they decreased price in

5     2019.  And the factor for decreasing price instead of

6     increasing price was the mere shadow of us entering.

7          So that's where the public would benefit is again going

8     back to that $585,000,000 in profit, if that went down, that

9     money doesn't come to us.  That money goes to the public.

10          THE COURT:  Right.  And again, just so I'm clear, the

11     public is still getting this drug, albeit at a higher cost.

12     It's not like the drug isn't available.  And if they can't get

13     the drug through this method of administration, there are

14     other ways that it can be administered, albeit not the

15     preferred way.

16          MR. GLASS:  Right.  So I'll address the oral and pill

17     in one second, Your Honor.

18          THE COURT:  Right.

19          MR. GLASS:  So access -- we don't have any evidence

20     that patients who need PAH treatments aren't getting access.

21     So I want to tell Your Honor we've had very limited discovery.

22     So we don't have that evidence.  But I will tell Your Honor

23     that there are patients who cannot afford the drug.  This

24     happens in every case where when the generic enters, the

25     number of patients on the treatment expands.

1          THE COURT:  Okay.

2          MR. GLASS:  The reason why is that when you have a

3    brand -- and I'm not good at math so I won't do the math for

4    you.  But you can divide the 600,000,000 in revenue by the

5    number of patients to see what the cost is per treatment, per

6    patient.

7          THE COURT:  Okay.

8          MR. GLASS:  Part of that is paid for by insurance

9    companies.  Part of that is paid for by the patients

10   themselves.

11         We know that there are patient assistance programs that

12   help lower means, patients, to get access to the drugs.  In

13   fact, UTC has a patient assistance program, it's on slide 14,

14   that when we were even threatening to enter, they improved the

15   benefit on the patient assistance program by a hundred

16   percent.  They cut the amount that the patients had to pay out

17   of their own pocket.

18         But there are two important things to note.  It's still

19   not zero, and there are patients who cannot even afford the

20   amount that the patient assistance program offers.  And there

21   are patients who UTC deems counteracts as the patient

22   assistance program and don't get the benefits.  So I don't

23   want to represent that we've got evidence from discovery

24   because it's been limited.  But I will tell Your Honor that in

25   the generic cases, which I've litigated many of, as have my

1    co-counsel, when the generic enters the number of patients

2    covered by the treatment expands, that expansion are patients

3    who are today unable to get on the preferred treatment.  Okay.

4         Now I'll do the three other routes.  I really want to

5    address your question on the three other routes.  What does

6    that mean for those patients?  Well, it's possible that

7    they're going untreated, but it's unlikely.

8              THE COURT:  Okay.

9              MR. GLASS:  The more likely is that they're being

10   treated by a less preferred drug.  It could be one of the

11   other three routes.  So there's intravenous, there's oral, and

12   there's inhaled.  It's possible that some of those patients --

13             THE COURT:  And they all are either not as effective

14   or bring other inherent risks to the patient rather than this

15   type of delivery?

16             MR. GLASS:  Exactly, Your Honor.  So a physician, not

17   us, not UTC, makes the determination which route of

18   administration is best for that patient.  And it's patient by

19   patient.  There are some patients that just -- inhaled works

20   best.  There are some patients that can't tolerate the pain of

21   injections.  There are some patients who are so sick that

22   inhaled and oral just doesn't work.

23        And so this is a physician decision.  So the physicians

24   are making the treatment decisions based upon what's best for

25   the patient.  The position the defendants are taking is that a

1    physician can't prescribe the preferred route of

2    administration for a particularly sick patient and must

3    prescribe oral or inhaled if they want a lower price.  And

4    that's just not right.  It's not right.  Physicians should be

5    free to prescribe the best administration for the patients.

6    And the physician shouldn't be put in the very difficult

7    position of saying, I'm asking the patient to pay more than

8    they should or the insurer to pay more than they should, and

9    therefore I'm going to have them do a less preferred.

10           Even between IV and subcutaneous, there is very little

11   switching.  So on slide 15, we have testimony from the

12   president of UTC.  He testified that there's very little

13   switching from IV to subQ.  He testified the more likely is

14   the other way around, subQ to IV.  And it makes sense.  There

15   are a lot of downsides to subQ and would only be if the

16   patient really needs it.  Most importantly there's a lot of

17   site pain.  There are also a lot of downsides to IV.  Most

18   importantly, sepsis, a deadly condition.  So physicians make a

19   determination on what's the best drug and what's the best

20   route of administration.

21           And if I may, Your Honor, the argument the defendants

22   make that PAH patients have all kinds of other ways they can

23   be treated, it just really doesn't help in an antitrust case.

24   In an antitrust case we don't consider every possible

25   substitute.  We only consider reasonable substitutes.  So in

 1   this case, it wouldn't be enough that bed rest would help a

 2   PAH patient.  That doesn't make it a substitute.  It's not

 3   enough that some PAH patients benefit from aspirin.  And it's

 4   not enough that some PAH patients are currently untreated or

 5   are on oral, IV or inhaled.  Since the doctors would put them

 6   on subcutaneous, and that's where they would get the distinct

 7   benefit of our competition.

 8        It's not just subcutaneous where they benefit from our

 9   competition, though.  IV patients benefit from our competition

10   once we get cartridges.  I'm going to take a second because

11   this is a little hard to explain.  We're currently offering

12   IV.  Plaintiffs offer IV.  However, to get on the formulary

13   for the insurance companies, and get the insurance companies

14   to say must substitute, and to get prescribers on board with

15   the generic, we also have to be on subQ.  We have evidence of

16   that.  We've put it in as a declaration, but it's in slide 16,

17   that our entry, even into IV has been muted because of our

18   inability to provide a subcutaneous option.

19        Physicians do not want to have to say, oh, the

20   Remodulin® substitute is only built for IV because they just

21   want to be able to prescribe generic or not.

22        Insurance companies are about simplicity and

23   efficiency.  They don't want to have to determine whether or

24   not a person is prescribed for subQ for IV or whether they're

25   prescribed for subQ or IV based upon some other sort of

1   payment avoidance.  So they've told us that we will not go on

2   a repertory -- we will not go on a formulary until we have a

3   subQ available product.  And so Your Honor, we're being

4   blocked not only from subQ, but really from IV as well.

5        Now, defendants have said we've brought all this on

6   ourselves.  That we should have done more diligence.  I've

7   already discussed with Your Honor that we didn't know this

8   would be a problem until the beginning of this year.

9        Defendants have also said, well, you shouldn't have

10  launched an IV.  But that also says that we shouldn't provide

11  any patients with a lower cost alternative.  That was not

12  palatable to Sandoz and RareGen.  Sandoz and RareGen launched

13  an IV so that at least some patients could get the benefit of

14  choice.  Even if it was imperfect and even if it was muted, we

15  were not going to hold back our IV product just to make this

16  case better.  Just to be able to tell Your Honor that we have

17  a great preliminary injunction.  Not even to preserve 180-day

18  exclusivity.

19       So this is really about patients.  We're trying to

20  serve patients.  We're trying to get that profit down, which

21  is a return directly to patients in the healthcare system.

22       And, Your Honor, I know my time is getting short, so I

23  won't spend too much time on this, but that is exactly what

24  defendants are worried about.  If we come on the market and we

25  compete with them, they will lose the Remodulin® franchise,

1   which would be devastating.  And you know what?  I don't blame

2   them.  It's been a great run.  They had patents.  They're

3   making 98 percent profit.  They're charging whatever they

4   want.  They're able to put in their annual reports that

5   they're making almost 600 million dollars.  But, Your Honor,

6   the patent is over.  They cannot use the anticompetitive

7   conduct to extend the patent.  They can't continue to block

8   the generics from being able to approach this patient

9   population.

10          But as you'll see in the slides that start my

11   presentation, that's exactly what they intended to do, and

12   that's exactly what they did.  And the way that they did was

13   despicable.  They went to the specialty pharmacies, and they

14   told the specialty pharmacies you will not get any more

15   cartridges until you sign these exclusivity agreements.

16          So Your Honor asked why, you know, we don't have

17   specialty pharmacies or insurers or patients as parties here.

18   Because none of them have done anything wrong.  It's a hundred

19   percent the conduct of defendants that have blocked us from

20   this market.  They did so by threatening to withhold

21   cartridges, which the president of UTC admitted -- on slide

22   4 -- was negotiating leverage to get the specialty pharmacies

23   to sign the contract that blocked RareGen and Sandoz.  And it

24   worked.  Because in May and late April of this year, after we

25   filed our case, CVS and Accredo signed the contracts saying

1    they will not dispense cartridges outside of Remodulin®, thus

2    blocking us completely from the market.

3         So Your Honor, I implore Your Honor -- first, I thank

4    Your Honor for the time that Your Honor's giving us today as

5    well as providing us with discovery because virtually

6    everything that we alleged in our complaint is true.  But it's

7    true to a more extreme than we ever thought.  We never thought

8    that the defendants would risk patient lives by withholding

9    cartridges.  We never thought that they would force the

10   specialty pharmacies to do something they didn't want to do,

11   and the only reason that the specialty pharmacies acquiesced

12   is because they couldn't go out of cartridges and thus leave

13   their own patients at risk.

14        We had no idea that Mr. Benkowitz and the witnesses in

15   this case would be so candid and tell us exactly what was

16   going on, and we had no idea they would have documents within

17   UT Smiths that shows that this was all designed to block us

18   from entering the market.

19        So Your Honor, thank you for providing us with

20   discovery and the time today.  What I would tell Your Honor is

21   that the clock is ticking.  We really need access to these

22   cartridges, but more importantly, the public needs access to

23   these cartridges.  Thank you, Your Honor.

24             THE COURT:  Thank you.

25             MR. PITT:  Your Honor, may I approach to hand up --

```
 1              THE COURT:  Please.

 2              THE DEPUTY COURT CLERK:  Thank you.

 3              THE COURT:  So if you're just looking at this from

 4   afar, and you go back in history and there was the lawsuit

 5   that ultimately was resolved and the resolution was the

 6   generic can come to market at such-and-such a time.  And

 7   meantime, there's this event that occurred, and you're buying

 8   up the means to which the generic can go to market.

 9   Optically, how does that work?

10              MR. PITT:  Well, Your Honor --

11              THE COURT:  The way I said it.

12              MR. PITT:  Respectfully, the way you said it, Your

13   Honor --

14              THE COURT:  Doesn't look good.

15              MR. PITT:  -- is not actually what occurred.

16              THE COURT:  I'm just saying the way I said it doesn't

17   look good optically.

18              MR. PITT:  If out of nowhere --

19              THE COURT:  There was a nefarious plan --

20              MR. PITT:  -- not proceeded by any other

21   arrangements, which they're trying to say the world started in

22   late 2018.

23              THE COURT:  Right.

24              MR. PITT:  The world started far before then with the

25   arrangements that my client, United Therapeutics, put into
```

1    place to ensure that their patients would have adequate pumps

2    and cartridges when they learned that Smiths was discontinuing

3    those items.

4          THE COURT:  I guess your position is we had enough

5    foresight to look forward to see what was going to happen.  We

6    wanted to protect our patients, so we fought the world and our

7    patient's protected.

8          MR. PITT:  Not exactly, Your Honor.  It's not that we

9    had some clairvoyant power to know what was going to happen in

10   the future.

11         THE COURT:  They told you what was going to happen.

12         MR. PITT:  They told everyone what was going to

13   happened.  Sandoz indisputably was on notice.  The

14   instances -- and why don't I just go right to it.  The

15   instances of Sandoz being on notice are many.  2011 when they

16   filed their ANDA, they expressly note that they need a

17   cartridge reservoir for the drug in order to inject it

18   subcutaneously.

19         Three years later, 2014, they receive tentative

20   approval so they know they're going to launch the drug.  What

21   do they do at that time?  Nothing.

22         2015, the following year, they settle the patent

23   litigation, and they know there's an agreed entry date of June

24   26th, 2018.

25         The agreement, by the way, Your Honor, also has a

1   provision that expressly says that nothing in the agreement

2   gives Sandoz any right to any pump or delivery system by a

3   third party or by United Therapeutics.  That's directly in the

4   agreement.

5          It's undisputed that --

6          THE COURT:  At that point the world knew what was

7   happening with the pump and the cartridge.

8          MR. PITT:  Well, certainly the customers did who had

9   received the end of life notice.  And certainly Sandoz did

10  right after then.

11         2016, this email is by Yaping Zhu who -- Dr. Zhu is, I

12  believe, the Senior Director of Device Development at Sandoz.

13  And this email is to the leaders of the product launch.  It

14  can't be disputed that Sandoz was on notice after having

15  signed that Hatch-Waxan lawsuit settlement.

16         On the topic of Hatch-Waxan, I think it's important to

17  note a couple of things, just in response to what we've just

18  heard.  First, Your Honor, Hatch-Waxan applies very

19  specifically to the drug.  It provides no access to delivery

20  mechanism, technology, or anything else.  It's all about the

21  drug.

22         THE COURT:  Understood.

23         MR. PITT:  And everyone who plans to launch a high

24  touch drug like this, and wants to be able to launch it to a

25  patient population that will be -- will have it administered

1    subcutaneously knows there is a lot of work to do to ensure

2    that there is a delivery system in place.  That is the work

3    that my client did to ensure that its patients -- that there

4    would be enough cartridges for its patients to use.

5         And now the plaintiffs come along and say, well, the

6    world actually started in 2018.  None of this stuff was here

7    before.  I can show you why that's wrong, Your Honor, and why,

8    in fact, the provisions that they are complaining about today

9    have always been aspects of the agreement, which was always an

10   exclusive arrangement with Smiths whereby Smiths would produce

11   cartridges they wouldn't otherwise have produced.  Wouldn't

12   have the charges here today to fight over if United

13   Therapeutics hadn't made the upfront investment and assumed

14   the risk, very importantly, for an activity that Smiths wasn't

15   willing to continue to engage in.  We did those things with

16   the expressed understanding -- and the contemporaneous

17   evidence all supports this -- we did those things with the

18   expressed understanding that, of course, they would be for our

19   patients.

20        THE COURT:  When does being forward-thinking, good

21   business sense, you becoming worried about your supply to

22   service your patients, when does that cross the line and

23   become anticompetitive conduct?  Not in this case, you're

24   going to say.

25        MR. PITT:  I was just going to say some place beyond

1    what we've seen here.

2         Your Honor, there is evidence, and we've submitted it,

3    that demonstrates that our client has forecasts of -- and to

4    be clear, in the past, every time we've had forecasts about

5    the burn rate of these cartridges, we have undershot that burn

6    rate significantly.  All of these additional instances of

7    cartridge production are generally for two reasons.  One is we

8    did not -- we thought cartridges would be used more slowly

9    than they were, but they fluctuate wildly, the use -- the

10   extent of the use does fluctuate.  And number two, all of what

11   you -- what you see in these agreements is also reflective of

12   the fact that people other than generics are trying to get

13   these cartridges.

14        THE COURT:  There was a point made that you didn't

15   know where the cartridges were going.  They were being used

16   for delivery of other medications.

17        MR. GLASS:  For antinausea medication, 88,000

18   cartridges.  RareGen itself tried to do a bulk purchase in

19   January 2019 of 300,000 cartridges.  There are reasons why my

20   client wanted to ensure that the original deal it struck,

21   which involved having enough cartridges for its patients for

22   an extended period of time because you need belt and

23   suspenders.  You need to be able to plan.  You can't always

24   know exactly when the next generation technologies are going

25   to come online, and you can't always predict what the

1   fluctuations will be in the patient's use of the cartridges.

2   And for all of those reasons, we set about ensuring that we

3   would have a steady supply.  What they want to do now is say

4   we did none of that.  And they say, well, we were bamboozled.

5   We think actually what happened was the specialty pharmacies

6   told us they could do it, but then they couldn't.  But if you

7   look closely, you'll see that they never asked about

8   cartridges until January 2019 was the first time they asked

9   about a supply of cartridges.

10          By the way, in early 2017, Your Honor, Sandoz wanted to

11  test its drug.  They tried to obtain just two pumps and two

12  cartridges, and they were unable to do it.  They were unable

13  to do it because they weren't being sold on the market

14  commercially because they had been discontinued.  Again, they

15  say they had no notice, but event after event after event

16  demonstrates that they did.

17          So finally, in January 2019, they asked the question

18  and they're told in no uncertain terms there are no cartridges

19  for you because there is this exclusive arrangement.  Those

20  cartridges are for United Therapeutics customers.

21          THE COURT:  So let's walk outside this courtroom now

22  and talk about the argument that counsel made that there are

23  real people out there that have issues that need this drug

24  that may not be able to afford this drug, and by keeping them

25  out of this market, you're either depriving them of a

1   preferred method of delivery or they're not getting any drug.

2         MR. PITT:  There is zero evidence of that, Your

3   Honor, and, frankly, it is simply not the case.  First of all,

4   the figures that they are using on price are -- the discounts

5   and the like, that's not price paid by patients.  That's

6   prices paid by payers, and those are decisions that go

7   through -- they talk about -- by the way, in describing their

8   alleged reputational harm, they talk about the specialty

9   pharmacies won't trust us, the prescribers won't trust us,

10  insurers and payers won't trust us.  Zero evidence of any of

11  that in the record.  Absolutely nothing in the record on any

12  of that.  They had additional depositions left over.  They

13  complain that they had limited discovery, but they had

14  additional depositions they didn't use.  For all the emphasis

15  that they've placed on the importance of specialty pharmacies,

16  the claim that they were threatened, which is absolutely not

17  supported --

18        THE COURT:  You say this is a money damage case?

19        MR. PITT:  I'm saying it's not an antitrust case

20  because there's no cause of action for a variety of reasons.

21  But to the extent that one day they could demonstrate

22  liability, then for a number of reasons, yes.  Number one,

23  what they're claiming would be compensable by monetary

24  damages, which the cases clearly reflect.  Number two, no

25  evidence of any of what they're now claiming would occur, only

1   speculation by some of their own employees that they are

2   worried that that kind of thing might occur.

3        You know, the -- there is even testimony from the

4   plaintiffs in which they concede that an injunction wouldn't

5   remedy the reputational harm that they're now claiming.  But I

6   want to actually get to another point about irreparable harm,

7   if I may, unless you want to stay on that topic.

8        THE COURT:  I'm curious.  Counsel brought up an

9   interesting point about the 180-day exclusivity.  So they've

10  lost that.  How is that calculable?  How is that repairable?

11       MR. PITT:  Well, first of all, it's not something

12  that they can recover for because it is self-inflicted.  I say

13  that for two reasons.  The first is they did make a choice.

14  They now have all kinds of explanations about why they did,

15  but it is undisputed that they made a choice.  There is a

16  slide which I'm not going to show because of our agreement

17  with counsel, but I would ask you to look at slide 15, which

18  is a table in which Sandoz and RareGen were debating, well,

19  what should we do and what are the financial consequences of

20  that?  And they ultimately made a decision to go for -- I know

21  they put everything in terms of the patient, the patient, the

22  patient.  They are not nonprofit companies.  They are

23  interested in making a profit, and in that case they were

24  interested in the short-term gain that this would afford them

25  rather than waiting until they solved their cartridge problem

 1 | before launching.

 2 |        The 180-day exclusivity would also have waited for

 3 | them, but they made the decision to launch.  And I don't see

 4 | how they can now claim that that is irreparable harm that is

 5 | compensable.  In connection with that point, Your Honor, the

 6 | following slide 16 here demonstrates that at the time they

 7 | made that decision, that expressly acknowledged that if they

 8 | went with the intravenous only plan, it would result in payers

 9 | not mandating generic substitution the harm they're now

10 | claiming they're suffering.  They knew all of this before they

11 | made the decision, but now they want to call it irreparable

12 | harm and say that it is somehow appropriate to upset what has

13 | been a nearly four-year arrangement for a supply that we have

14 | relied on and continue to rely on.  It's simply not the case

15 | that we wouldn't be harmed if all of a sudden Your Honor were

16 | to say those cartridges that you invested in and that you

17 | assumed the risk to have made and that you have always had an

18 | understanding with Smiths were for your patients and that

19 | you've built your business plans around and your distribution

20 | chain, those are now going to be given -- or some number of

21 | them are now going to be given to another company, of course

22 | we would be harmed, Your Honor.

23 |        THE COURT:  When you say "your patients," though,

24 | clearly when you were the only drug on the market, they were

25 | your patients.  But now that there could be other drugs on the

1    market, don't your patients have a right to say I'd rather

2    have a generic rather than a branded?

3            MR. PITT:  Well, the patients may or may not have

4    that right, Your Honor, but when the company that is making

5    the generic drug is repeatedly on notice of the need to

6    provide an administration mechanism and doesn't do it, the

7    fact that some patients aren't able to get the generic for a

8    certain kind of administration is not at our doorstep.  And

9    the antitrust laws don't permit a competitor who is not an

10   equally efficient competitor to come in at the last minute and

11   sort of say, well, gee, we need what they have.  They planned

12   for it, but we need it so now we want you to order it given to

13   us.  That's simply now how they work.

14          The -- just a couple of other points to touch upon some

15   things we heard.  Obviously, if Your Honor has other

16   questions -- I also wanted to mention that Mr. Boyle, who

17   represents Smiths, may want to also say a few words.  And we

18   only have kind of one time to stand up here, so I want to make

19   sure that if I'm starting to push the limits of what Your

20   Honor had in mind in terms of time, that we give Mr. Boyle

21   some opportunity as well.

22          But just a couple of other points.  They -- again, I

23   would say that the -- that the alternatives that have been

24   available to them are something that we haven't heard a lot

25   about.  But one of the reasons why it's so critical to note

 1   that in that -- in that whole seven-year period of time when

 2   the plaintiffs were repeatedly on notice of the need to

 3   provide for this, what could they have done?  Well, they could

 4   have done any number of things.  They could have done what

 5   they ultimately wound up doing in May of 2019 and contracted

 6   with somebody to start manufacturing a cartridge.  They claim

 7   they weren't aware of that.  But the fact is, Your Honor, they

 8   had no arrangement, no agreement, no contract with somebody --

 9   a specialty pharmacy or otherwise -- to manufacture a

10   cartridge for them, no written commitment of this supply.

11   This particular supply is yours, and your patients will have

12   access to it.  None of that until in May of 2019 they finally

13   contracted with a company -- whose name I've agreed not to

14   state in open court -- but they've contracted with a company

15   who then, in a matter of just a few months, was able to

16   produce a prototype.  We have no visibility into why they

17   haven't yet sold it.  We asked -- all of the documents suggest

18   that September or October was the date in which that was to

19   occur.  We have not -- we've asked for some discovery of that

20   and they've not given it to us, so we don't really have any

21   visibility into why now they have not yet sold it.  But we do

22   know they had also sought to make arrangements with another

23   company.  Again, I won't mention the name here.  And they

24   ultimately sent a breakup letter to that company saying we're

25   not interested.  We're going with this other company.

1    The cost for these things, by the way, developing a

2    prototype was cited at around $50,000.  We're not talking

3    about a huge cost.  If you'd like to see what a cartridge

4    looks like, it's this.  This is the cartridge that we are

5    fighting over today.

6    I want to talk just briefly about the fact -- the sort

7    of world not starting in late 2018 point.  By the way, also

8    many options, before I get there, of pumps, that the ability

9    -- both experts in this case agree you can customize --

10    THE COURT:  What was your company doing prior to this

11    product coming on the market as far as delivery?

12    MR. PITT:  As far as prior to the CADD MS®3 coming on

13    the market?

14    THE COURT:  Yes.

15    MR. PITT:  I believe we believed we used the MiniMed.

16    There was another pump that we used called the MiniMed, and

17    that pump is still being used, I believe, in other countries.

18    Could be cleared, if one wanted to try to go through the

19    process of clearing it through the FDA, could be cleared again

20    for use in this country.

21    The MS®3 itself, by the way, used to be an insulin

22    pump.  It was modified essentially with some software

23    modifications so that it was capable of dispensing Remodulin®

24    subcutaneously.  That's what Smiths did.  That's how they got

25    the pump originally.  Both experts in this case have agreed

1    that to do that now would involve a time period of 12 to 24

2    months.  They both agree it could be done in that time period

3    of a cost of around one-and-a-half to three-and-a-half million

4    dollars.  Frankly, all of which is a pretty small fraction, if

5    you look at the following slide, which I'm not going to show

6    in open court.

7          THE COURT:  22?

8          MR. PITT:  Yes.  It's a small fraction of what it

9    would have cost or, rather, what the parties believed or what

10   the plaintiffs believed they were going to make in just their

11   first year of operation here.

12         On the point, Your Honor, of whether the world started

13   in late 2018, I don't need to go through all of this because

14   it's -- it is in our papers, Your Honor, but I do want to be

15   clear that the contemporaneous evidence strongly supports the

16   fact that this agreement has always been an exclusive

17   arrangement between Smiths and United Therapeutics.  There

18   were amendments along the way when various things happened,

19   when we saw cartridges flying off the shelves and we realized

20   we needed to do something in order to honor the purpose and

21   effect of that original agreement.  But the agreement has

22   always involved exclusivity.

23         You know, a quick word, I guess, on the public interest

24   and on -- well, I guess really on the public interest in

25   particular.

1          Again, I've already discussed the fact that there is no

2    evidence that any patient is being harmed.  In fact, their own

3    employees testified that no patient is being deprived of any

4    drug.  There is no evidence in the record that any patient is

5    actually even paying more.  There is evidence about the

6    pricing to specialty pharmacies, not to patients.

7          The public interest is not furthered when companies are

8    disincentivized from having foresight and making investments

9    and assuming risks in order to prepare for their future needs

10   and then know that they will risk having another company,

11   their competitor, direct competitor, come along and simply

12   strip them of the fruits of their investment.  That does not

13   serve the public interest, Your Honor.

14         We've got a number of other points in our papers, but I

15   think at this point I've really covered most of what I was

16   intending to cover with Your Honor, but I'm glad to answer

17   further questions or else to turn things over to Mr. Boyle to

18   make the points that he was interested in making.

19              THE COURT:  Okay.

20              MR. PITT:  Thank you, Your Honor.

21              THE COURT:  I think you have about nine minutes.

22              MR. BOYLE:  Thank you, Your Honor.  Peter Boyle for

23   Smiths Medical.  I just want to make a few points.

24         Smiths has been trying to wind down the MS®3 product

25   line for five years now.  The reason it's in the middle of

1   this case is because it did the right thing for patients by

2   entering into a supply arrangement with United Therapeutics to

3   extend production on both the MS®3 pump and the MS®3

4   cartridge.

5          To be clear, the pump is discontinued.  Smiths stopped

6   making that product and selling it in 2017.  The cartridges,

7   which now seem to be the focus of this case, those products

8   would not exist today but for the arrangement with United

9   Therapeutics and Smiths.

10          Counsel for plaintiffs made reference to our

11   end-of-life notice for the pump.  That went out in August

12   2015.  They want to act like that notice did not tell

13   customers what was going on with cartridges at that time.  If

14   you look at the end-of-life notice, Smiths told customers in

15   August 2015 that cartridges would be available for around

16   another three years.  We submitted a declaration from Carl

17   Stamp in connection with these proceedings.  Mr. Stamp was

18   head of marketing and business strategy at Smiths back in

19   2015.  He clearly states in his declaration, in the absence of

20   the UT arrangement with Smiths, Smiths would have stopped

21   making those cartridges some time in 2018.  They would not

22   have been available for the generic launch of this product.

23          One of the positions that plaintiffs have taken with

24   respect to the cartridge is the margins on the cartridge --

25   the gross margins were so high that in some gerrymandered

1   but-for world, Smiths would've just kept making these products

2   indefinitely.  That's not true.  Smiths had already decided to

3   discontinue this product.

4        We have evidence from Chris Quinn.  We submitted a

5   declaration from him.  And Nate Walker has -- who is one of

6   our global product managers -- gave a deposition.  If you look

7   at those pieces of evidence, Your Honor, you'll see Smiths was

8   not going to continue making these products.

9        Just to put this in perspective, in fiscal year 2019,

10  that ended in July, Smiths only made about $500,000 in

11  revenue.  That's top line revenue -- not profit -- on the

12  cartridges.  I mean, we seem to be talking about hundreds of

13  millions of dollars, and plaintiffs are suggesting they, they,

14  they are going to make all this money.  Smiths isn't making

15  that type of money off of this product.

16       To continue the cartridge production, Smiths and

17  plaintiffs point to this evidence.  Smiths would have had to

18  retool the mold.  That's a $300,000 expense.  They would have

19  had to qualify new resin.  That's about a $220,000 expense

20  that the record shows.

21       So if you compare that to the revenues Smiths was

22  making off of this product, the economics don't make it worth

23  the while of Smiths to continue making the product but for the

24  investment by United Therapeutics.

25       Now, if you look at the record, it is clear Smiths did

1    not try to keep a generic off the market in this instance.  In

2    2016, it told Sandoz two or three times that MS®3 was going to

3    be discontinued.  In fact, one of our people told Sandoz that

4    it doesn't make sense to bring a new drug to market on the

5    back of a discontinued product.  Sandoz ignored us.  They went

6    forward anyway.  They took the position, we're a drug

7    manufacturer.  Devices are not our problem.

8         In 2019, when they found out they really had a problem,

9    they came back to Smiths.  Now, at that time all the cartridge

10   production that was still available was contractually

11   committed to United Therapeutics.  It had been committed years

12   before.  But even though Smiths could not sell cartridges to

13   the plaintiffs, it tried to help them.  It offered them the

14   CADD legacy pump.  That's the pump that's used for IV infusion

15   of Remodulin®, Your Honor.  It has subcutaneous functionality.

16        Smiths also offered to license the cartridge

17   technology, help them figure out the product specifications,

18   know-how around product development and product manufacturing.

19   They turned that down.  We can't help that.

20        One thing is really clear.  Smiths did not take any

21   action here that kept this generic off the market.  This is

22   not an antitrust problem.  Whatever problem it is, it's not an

23   antitrust problem.

24        The one thing I will say, just to follow up on what Mr.

25   Pitt said in response to plaintiff's counsel's argument, there

 1    seems to be some suggestion here that the plaintiffs are

 2    really taking it on the chin in terms of price.  Our economist

 3    in his expert report has some facts in there that show that in

 4    this environment, the brand of generic are being reimbursed by

 5    payers, Medicare, Medicaid payers, at the same rate.

 6          They also have a slide in here on page 14 of their

 7    slide deck showing that the brand actually lowered the amount

 8    of co-pay for the patient.  So we actually may be in a

 9    situation now where the patient today may be paying less for

10    the brand than the generic.

11          So that is one final point.  So with that, Your Honor,

12    for defendants, we'd just ask that you deny the preliminary

13    injunction.  We also urge Your Honor to take a look at our

14    motion to dismiss and grant that as well.  If there are no

15    further questions or any questions --

16          THE COURT:  No.  Thank you.

17          MR. BOYLE:  Thank you.

18          MR. KENT:  Good morning, Your Honor.

19          THE COURT:  Welcome.

20          MR. KENT:  Matthew Kent from Alston & Bird on behalf

21    of the plaintiff Sandoz Inc.  PowerPoint seems to be very

22    popular today, so I have one to provide you as well.

23          THE COURT:  Okay.

24          MR. KENT:  Your Honor, the argument that Sandoz and

25    RareGen were not diligent is nothing but an effort and

1    misdirection to misdirect this Court away from the defendant's

2    conduct in this case from their efforts to block patients from

3    a cheaper generic alternative.  And there are two points that

4    I want to walk the Court to that are specifically responsive

5    to some of your questions that you posed to defendant's

6    counsel as well as Mr. Glass.

7         First, I'm going to walk through the evidence that

8    shows that Sandoz and RareGen were diligent in pursuing their

9    launch of treprostinil.  And second, I'm going walk through

10   the timeline because I think it's critical that the Court

11   understands when these restrictions were put in place because

12   it shows that the free-riding argument that the defendants are

13   setting forth doesn't make sense.  It shows that the fact that

14   the cartridges were not actually restricted at all for

15   specialty pharmacies before 2019, it's something we actually

16   agree on, and it also shows that the purpose and the intent of

17   these arrangements was to block generic competition.

18        So let's start with Sandoz and RareGen's diligence.

19   Now, I understand the diligence story.  Your Honor correctly

20   got to the crux in the initial questions that you were asking

21   Mr. Glass.  We have Sandoz and RareGen who produce the drug,

22   and their customers, they are the specialty pharmacies.  The

23   specialty pharmacies here, they're the ones that provide the

24   drug to patients, and they have always provided the cartridges

25   and provided the pumps to patients.

1      And so when we think about the launch here, Sandoz and

2   RareGen did exactly what you would expect a company to do.

3   They went and they spoke to their customers at Accredo, and

4   they asked them, what do we need to provide?  And we see in

5   August of 2017, on Exhibit 906, that Accredo confirmed -- I

6   have it highlighted in yellow -- Accredo expects Sandoz to

7   provide treprostinil vials only.  And that's critical.  That's

8   diligence.  Sandoz was going to its customers and it was

9   asking, what do we need to provide, and it got an answer.

10      They also did the same thing with CVS.  We did not cite

11   this particular presentation in our brief, but Exhibit 907 is

12   a CVS presentation that talks about how CVS SP will procure

13   the pumps.

14      RareGen did the same thing.  It talked to Accredo.  It

15   sent emails in May of 2018.  That's Exhibit 314.  It asks

16   whether or not Accredo would have to provide pumps and

17   cartridges or whether they, RareGen, would have to come up

18   with those.  And Accredo responded no.  We handle the pumps.

19      THE COURT:  Well, at that point, does your client

20   know what's going on with Smiths?

21      MR. KENT:  Well, Your Honor, I think this is a great

22   effort at a sleight of hand in this direction because this is

23   not a problem with the pump.  So counsel for the defendants,

24   they keep talking about the end-of-life notice that was sent

25   in 2015 by Smiths, but that is an end-of-life notice for the

1   pumps.  It is undisputed that that did not relate to

2   cartridges.  And, in fact, when you look at that end-of-life

3   notice, you'll see that it talks about the cartridges being

4   made for many years in the future.  And in fact, we saw in the

5   marketplace that the specialty pharmacies, Accredo and CVS,

6   were able to continue to supply pumps and cartridges to

7   patients.  There was no reason for Sandoz and RareGen to think

8   that UTC would use coercive, extreme measures to try to get

9   those specialty pharmacies to agree to those restrictions.

10          And Mr. Glass didn't have a chance to go through, but

11   if Your Honor would look at slide 3 of the PowerPoint

12   presentation that Mr. Glass had, it has some of the salacious

13   statements that the specialty pharmacies were going through.

14   We're in serious need of product and will not be able to

15   service our patients.  This will have a significant impact on

16   our patients.  This is a huge risk to the patients.  They were

17   withholding cartridges that are needed, lifesaving medicines

18   that are needed for patients in order to extract efforts to

19   block the generic.

20          And I'll tell Your Honor, the most clear evidence of

21   that blocking is cited in our brief.  It's Exhibit 475.  And

22   it's on page 16 of our papers.  It says, "We have a contract

23   amendment from UTC that requires us to only sell to MS®3

24   cartridges to UTC designated customers.  It is very important

25   to UTC to prevent generic drug users."

1    And that's precisely what's happened.  They have

2    blocked generic drug users by creating a restriction so that

3    specialty pharmacies cannot use those cartridges for patients

4    with generic treprostinil.

5    I want to show one thing that we do agree on which is

6    the timeline.  It is undisputed in this case that Sandoz and

7    RareGen didn't know of the cartridge restrictions until

8    January of 2019.  And let's put up the timeline.  There are a

9    lot of agreements in this case, Your Honor, and in fact, in

10   reading the statement of facts, it can be hard to follow.  So

11   we created a timeline of these agreements.

12   Now, the defendants want you to believe that with the

13   end-of-life notice that they were somehow diligent and that

14   they came up with a path forward and were, in essence, free

15   riding.  That is simply not the case.  The end-of-life notice

16   came out before the first agreement was entered into.  But

17   ultimately, these agreements are not the most important ones

18   in this case because they relate to pumps.

19   Now, if you go to the next slide, each of the

20   agreements that I've marked an X over, they don't restrict the

21   cartridges.  The cartridge restrictions were not even done in

22   January of 2019.  They were done in April and in May of 2019.

23   And so in January, when Sandoz, when RareGen first learned of

24   the issue with the cartridge restrictions, they immediately

25   spring into action.  They immediately start to try to figure

1    out what is going on here.  But before 2019, there were no

2    cartridge restrictions on the specialty pharmacies.  And

3    that's critical.

4         We cite to the testimony of each of the Sandoz and

5    RareGen's employees that confirm this point.  That's on page

6    39 of our papers.  And I want to show the Court just the

7    initial pages of each of these agreements where there's

8    finally the restriction.  Because, again, April of 2019 is

9    when that restriction comes into place.

10        Now, we can look also at the CVS, which is Exhibit 723,

11   the May 2019 agreement.

12        Now, defendants, they -- the idea that a generic

13   drugmaker would need to go out and develop and manufacture its

14   own device, that's just wrong as a matter of fact and it's

15   wrong as a matter of law.  And Your Honor hit on a very

16   critical point.  It requires the Court to find that Sandoz

17   would have or should have assumed that UTC was going to breach

18   that patent settlement.  And I want to take a look at that

19   patent settlement because it's critical to this case.

20        So we have the settlement in September of 2015.  It's

21   Exhibit 1006, and it's clear, UTC was not to take any action,

22   directly or directly, to prevent, delay, limit or otherwise

23   restrict the launch.

24        Now, they keep pointing to a clause about the delivery

25   devices, but that related to UTC-developed delivery devices.

1  There was no way for Sandoz and RareGen to know that UTC and

2  Smith would get together and would sign agreements that

3  effectively blocked the generic from entering the market by

4  having these cartridge restrictions.

5        Now, the bottom line is that without UTC's blocking

6  conduct, without the restrictions on the cartridges that

7  weren't in place until April or May of 2019, Sandoz and

8  RareGen would have brought a cheaper, lower cost generic to

9  the market to serve subcutaneous patients.  And as Mr. Glass

10  said, it's important for us to be able to come to market and

11  bring a product to reduce costs because that is what our

12  companies are all about.

13        Now, Sandoz and RareGen did launch the IV.  They chose

14  in March of this year to launch in the IV space.  And the

15  reason they did that is because it's the right decision.  It's

16  the right decision morally.  It's the right decision

17  ethically.  It's the right decision as a matter of law.  And

18  I'm sure that had Sandoz and RareGen decided not to launch in

19  the IV space, UTC would have been thrilled because it would

20  have continued.  It would have allowed them to main their

21  monopoly not just over the subcutaneous market through their

22  blocking of the cartridges, but also over the IV space.

23        And, again, that, Your Honor, is just another

24  diversion.  It's another effort to try to avoid and misdirect

25  the Court from the coercive and bad conduct of the defendants.

1      Your Honor, I'd like to provide the rest of my time to

2  my co-counsel, Mr. Glass.  Thank you.

3          MR. GLASS:  Hello again, Your Honor.

4          THE COURT:  How are you?

5          MR. GLASS:  So with the last few minutes I would like

6  to reflect upon what is not in dispute.  What is not in

7  dispute is as of today, there is no competitor to Remodulin®

8  subcutaneous.  As of today, the competition that RareGen and

9  Sandoz bring to IV is severely impaired by the blocking of the

10 subcutaneous route.  As of today, UTC is making an incredible

11 profit.

12     And I heard Smith's counsel say that they're innocent

13 in all of this, but as we all know, they are a co-conspirator.

14 They've engaged in overt acts.  They are on the hook.

15 Whatever contractual provisions they have between themselves

16 are invalid and unenforceable.  And they certainly can't be an

17 excuse for engaging in any competitive conduct.

18     As of today, the defendants are blocking competition to

19 the detriment of not only RareGen and Sandoz, but patients,

20 prescribers, and payers.

21     They should not be allowed to benefit from that

22 conduct.  That's why the antitrust laws are here:  To preserve

23 competition.  The only argument I really heard from defendants

24 is that you should conflate pumps and cartridges.  Because

25 there was an end of life pump notice in 2015, we should assume

1   that everyone in the market knew the cartridges were going to

2   be unavailable.  But that's not consistent with the facts.  As

3   Mr. Kent noted, that end-of-life notice says in the end

4   cartridges weren't end of life.  And in fact, the cartridge

5   end-of-life notice didn't come until this year.

6        Second, defendants are arguing that somehow their

7   secret agreement to monopolize and extend the patent to block

8   competition is something that we should have fixed.  How can

9   that be the standard in an antitrust case where the -- the

10   plaintiffs not only need to somehow, without discovery, figure

11   out what was going on, but then remedy it?  We saw the slides

12   about the alternative options.  One option was new pumps.  Two

13   years.  That's what the slide said.  Two years.  None of those

14   are approved to be used in the United States.  None can be

15   approved for a long period of time.

16        We heard that all they want to do is serve Remodulin®

17   patients.  But Your Honor, the Remodulin® patients are

18   everyone.  So every patient we take, they don't need to serve.

19        As we heard from the president of the UTC, as well as

20   many other witnesses, there is enough resin to make cartridges

21   for ten years.  There is no limit on cartridges except the

22   limit that they've imposed on the specialty pharmacies to

23   dispense them.  This is not about them serving patients.

24        Finally, there's this notion that cartridges wouldn't

25   exist but for the secret agreement.  First, that's

1    self-serving testimony that doesn't match with the evidence.

2    And Your Honor has plenty of evidence to review to see that

3    that's just not true.

4         Smiths may have wanted to discontinue the pumps, but

5    the cartridges are a different story.  They didn't discontinue

6    them.  And Your Honor, as we engaged, if they had a problem

7    with the profitability of the cartridges, the simple solution

8    is to raise the price.  In fact, had Smiths put the cartridges

9    up for auction and said, look, UTC, bid against RareGen and

10   Sandoz, they would have maximized the value of these

11   cartridges.  But instead, in a secret agreement, they sold

12   them for pennies on the dollar.  That's not our fault.

13        As we've said earlier today, if they're up for auction

14   today, we would outbid UTC.  That's how important these

15   cartridges are to us.

16        So I don't want the distractions of all the timelines

17   and all of the quotes to miss that today patients are losing

18   out.  And in fact, the patient assistance program shows

19   exactly how they're losing out.  It's not just that specialty

20   pharmacies pay more.  It's not just that insurers pay more.

21   It's not just that Medicare and Medicaid pay more.  All those

22   should matter.  It's that patients pay more.

23        Your Honor, this is a very important case.  There are

24   not a lot of people who take these, but those who do, it costs

25   an incredible amount of money.

```
1            THE COURT:  Okay.

2            MR. GLASS:  Thank you, Your Honor.

3            THE COURT:  Thank you.

4            Counsel.

5            MR. PITT:  If Your Honor would permit me just a quick

6   moment to respond to some of those points.

7            THE COURT:  Sure.

8            MR. PITT:  That would be wonderful.  Thank you.  I'll

9   be very brief, Your Honor.

10           First, I wanted to point out that Mr. Kent pointed to

11  an email from August 10th, 2017, in which Accredo said all you

12  need to do is just give us the vials.  I wanted to point out

13  that there is another part of that timeline which is -- this

14  is in our papers, but Sandoz had gotten a report from McKinzie

15  that said due to the pump issues, there's a substantial chance

16  of a delayed launch.

17           Sandoz then, in December of 2017, shut down its launch.

18  They suspended it for those reasons.  So the idea that that

19  one Accredo email somehow gave them all of the certainty they

20  needed in order to do a complex and very expensive launch like

21  this doesn't really match with the evidence.

22           The end-of-life notice point, the end-of-life notice

23  did pertain to cartridges.  It -- what it states is that there

24  will be enough cartridges to serve the then extent pumps.

25  That is another three years.
```

1     The contemporaneous documents, which we've cited in our

2 papers, demonstrate that had there been no restriction on the

3 use of those cartridges, those cartridges only would have

4 lasted until February 2019.  That is a month before Sandoz and

5 RareGen decided to launch.  It was only through the Remodulin®

6 only restrictions that they were projected to last until 2022

7 at the outset.

8     The point about the supposedly coercive and extreme

9 tactics taken with the specialty pharmacies, Your Honor, I

10 would only say that their quotes are extremely selective.

11 There is -- it is completely undisputed that every order for

12 cartridges placed by a specialty pharmacy was fulfilled.

13 Every single one.  There was no denial of any order of

14 cartridges.  The witnesses testified that there were no

15 threats.  And, in fact, the witness who negotiated with the

16 specialty pharmacies, not for the contract between Smiths and

17 the specialty pharmacies, which were not never even executed,

18 which they're talking about, but the United Therapeutics'

19 contracts with the specialty pharmacies, he testified that

20 there were absolutely no problems.  They opted not to depose

21 anyone from the specialty pharmacy.  And I think it's fair to

22 ask why that is.

23     Just a couple of other points.  The -- what they say

24 they want to do, they want to ask you to look at the aspects

25 of the arrangement between Smiths and United Therapeutics that

1    they don't like and to condemn those without looking at the

2    overall arrangement that existed and that the contemporaneous

3    evidence shows always existed between those two parties.  The

4    law doesn't permit that kind of disaggregation of an economic

5    relationship when analyzing the economic or competitive

6    effects of it.  And the evidence doesn't support that.

7            The settlement clause that says there is no entitlement

8    to a delivery mechanism does reference other pumps made by

9    third parties and delivery mechanisms made by third parties.

10   And the -- I guess those are the primary points I wanted to

11   address.  Thank you, Your Honor.

12           THE COURT:  Counsel, thank you very much.

13           I will permit a five-page closing, if you will.  I was

14   going to say 14 days, but that's a horrible end date.  So

15   seven.  This way at least you can have a week and hopefully

16   not focus on this case.

17           MR. BENNETT:  Seven days.  The 17th.

18           THE COURT:  Let's see.  Ten?

19           MR. GLASS:  Your Honor, I mean, it's a long time for

20   these cartridges to be unavailable.

21           THE COURT:  Okay.  You want three?

22           MR. GLASS:  I don't speak for Sandoz, but we'll be

23   prepared to submit as quickly as Your Honor can take it.

24           THE COURT:  Seven?

25           MR. BENNETT:  Seven is fine with us.

1          THE COURT:  Seven.  Okay.  Anything further?

2          MR. GLASS:  Thank you, Your Honor.

3          THE COURT:  Counsel, thank you very much.  Wonderful

4    job in papers and verbally today.  Enjoy the holidays as best

5    you can.  Thank you.

6          THE DEPUTY COURT CLERK:  All rise.

7          (Court concludes at 12:33 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE.

2              - - - - - - - - - - - - - - - - - - - - -

3

4      I certify that the foregoing is a correct transcript from

5  the record of proceedings in the above-entitled matter.

6

7

8      I

9

10

11  **/S/ Megan McKay-Soule, RMR, CRR**      **December 11, 2019**

12          Court Reporter                              Date

13

14

15

16

17

18

19

20

21

22

23

24

25

**$**

**$220,000** [1] - 43:19
**$300,000** [1] - 43:18
**$50,000** [1] - 39:2
**$500,000** [1] - 43:10
**$585,000,000** [1] - 20:8
**$599,000,000** [1] - 19:14

**/**

**/S** [1] - 59:11

**0**

**07101** [1] - 1:10
**08540** [1] - 2:13

**1**

**10** [2] - 1:10, 3:3
**100** [1] - 19:20
**10010** [1] - 2:5
**10016** [1] - 1:16
**1006** [1] - 50:21
**10:50** [2] - 1:11, 3:3
**10th** [1] - 55:11
**11** [1] - 59:11
**12** [2] - 19:12, 40:1
**1201** [1] - 1:19
**12:33** [1] - 58:7
**13** [1] - 19:21
**14** [4] - 19:21, 21:13, 45:6, 57:14
**14th** [1] - 2:18
**15** [3] - 3:22, 23:11, 35:17
**16** [3] - 24:16, 36:6, 48:22
**17th** [1] - 57:17
**180** [2] - 14:8, 15:10
**180-day** [6] - 14:8, 14:12, 15:8, 25:17, 35:9, 36:2

**2**

**2,000** [1] - 17:14
**20005** [2] - 2:9, 2:19
**2011** [1] - 29:15
**2014** [1] - 29:19
**2015** [9] - 12:22, 13:10, 29:22, 42:12, 42:15, 42:19, 47:25, 50:20, 52:25
**2016** [3] - 13:10, 30:11, 44:2
**2017** [5] - 33:10, 42:6, 47:5, 55:11, 55:17

**2018** [11] - 7:8, 13:4, 13:13, 20:4, 28:22, 29:24, 31:6, 39:7, 40:13, 42:21, 47:15
**2019** [20] - 1:10, 3:3, 20:5, 32:19, 33:8, 33:17, 38:5, 38:12, 43:9, 44:8, 46:15, 49:8, 49:22, 50:1, 50:8, 50:11, 51:7, 56:4, 59:11
**2022** [1] - 56:6
**215** [1] - 1:24
**22** [1] - 40:7
**220** [1] - 2:13
**24** [1] - 40:1
**26th** [1] - 29:24

**3**

**3** [1] - 48:11
**300** [1] - 2:13
**300,000** [1] - 32:19
**30309** [1] - 1:19
**314** [1] - 47:15
**39** [1] - 50:6
**3:19-cv-10170-BRM-LHG** [1] - 1:4

**4**

**4** [1] - 26:22
**475** [1] - 48:21

**5**

**50** [1] - 1:10
**51** [1] - 2:4
**584.9** [1] - 19:14

**6**

**600** [1] - 26:5
**600,000,000** [1] - 21:4
**607** [1] - 2:18

**7**

**723** [1] - 50:10
**725** [1] - 2:9
**779-6437** [1] - 1:24

**8**

**88,000** [1] - 32:17

**9**

**90** [1] - 1:15
**900** [1] - 2:18
**906** [1] - 47:5

**907** [1] - 47:11
**98** [2] - 19:9, 26:3

**A**

**a.m** [2] - 1:11, 3:3
**ability** [1] - 39:8
**able** [22] - 3:19, 7:11, 7:22, 9:5, 9:16, 9:23, 11:3, 14:2, 15:13, 18:22, 24:21, 25:16, 26:4, 26:8, 30:24, 32:23, 33:24, 37:7, 38:15, 48:6, 48:14, 51:10
**above-entitled** [1] - 59:5
**abruptly** [1] - 13:13
**absence** [1] - 42:19
**absent** [2] - 16:25, 17:1
**absolutely** [3] - 34:11, 34:16, 56:20
**access** [11] - 9:19, 11:17, 18:20, 19:8, 20:19, 20:20, 21:12, 27:21, 27:22, 30:19, 38:12
**accommodating** [1] - 3:5
**Accredo** [15] - 6:18, 13:8, 13:9, 13:12, 16:19, 26:25, 47:3, 47:5, 47:6, 47:14, 47:16, 47:18, 48:5, 55:11, 55:19
**Accredo's** [2] - 13:7, 16:23
**acknowledged** [1] - 36:7
**acquiesced** [1] - 27:11
**act** [2] - 12:23, 42:12
**ACTION** [1] - 1:3
**action** [4] - 34:20, 44:21, 49:25, 50:21
**activity** [1] - 31:14
**acts** [1] - 52:14
**addition** [3] - 6:2, 9:4, 15:19
**additional** [3] - 32:6, 34:12, 34:14
**address** [3] - 20:16, 22:5, 57:11
**adequate** [1] - 29:1
**administered** [3] - 19:4, 20:14, 30:25
**administration** [7] - 20:13, 22:18, 23:2, 23:5, 23:20, 37:6,

37:8
**admitted** [1] - 26:21
**Adrienne** [1] - 4:15
**ADRIENNE** [1] - 2:12
**advantage** [1] - 15:12
**afar** [1] - 28:4
**afford** [4] - 20:23, 21:19, 33:24, 35:24
**agree** [5] - 39:9, 40:2, 46:16, 48:9, 49:5
**agreed** [5] - 6:1, 19:24, 29:23, 38:13, 39:25
**agreement** [19] - 5:15, 14:18, 15:7, 16:25, 17:1, 29:25, 30:1, 30:4, 31:9, 35:16, 38:8, 40:16, 40:21, 49:16, 50:11, 53:7, 53:25, 54:11
**agreements** [8] - 26:15, 32:11, 49:9, 49:11, 49:17, 49:20, 50:7, 51:2
**ahead** [1] - 3:24
**aided** [1] - 1:25
**albeit** [4] - 19:2, 19:3, 20:11, 20:14
**alerted** [1] - 12:8
**alleged** [2] - 27:6, 34:8
**allowed** [2] - 51:20, 52:21
**almost** [2] - 15:12, 26:5
**Alston** [3] - 4:7, 4:9, 45:20
**ALSTON** [2] - 1:14, 1:17
**alternative** [6] - 13:20, 13:21, 13:22, 25:11, 46:3, 53:12
**alternatives** [2] - 13:19, 37:23
**amendment** [1] - 48:23
**amendments** [1] - 40:18
**amount** [4] - 21:16, 21:20, 45:7, 54:25
**analyzing** [1] - 57:5
**ANDA** [2] - 14:9, 29:16
**announced** [1] - 12:10
**annual** [3] - 19:11, 19:12, 26:4
**answer** [3] - 14:6, 41:16, 44:9
**anticipated** [1] - 8:5
**anticompetitive** [3] - 8:6, 26:6, 31:23
**antinausea** [1] - 32:17

**antitrust** [8] - 23:23, 23:24, 34:19, 37:9, 44:22, 44:23, 52:22, 53:9
**anyway** [2] - 3:23, 44:6
**appear** [1] - 3:19
**APPEARANCES** [1] - 2:1
**appearances** [2] - 3:23, 3:24
**applies** [1] - 30:18
**apply** [1] - 17:8
**appreciated** [1] - 3:6
**approach** [4] - 5:3, 11:19, 26:8, 27:25
**approached** [3] - 7:7, 12:5, 13:15
**appropriate** [1] - 36:12
**approval** [1] - 29:20
**approved** [2] - 53:14, 53:15
**April** [5] - 13:17, 26:24, 49:22, 50:8, 51:7
**arguing** [1] - 53:6
**argument** [6] - 23:21, 33:22, 44:25, 45:24, 46:12, 52:23
**arguments** [2] - 3:21, 8:4
**arrange** [1] - 8:18
**arranged** [1] - 8:7
**arrangement** [12] - 8:18, 8:19, 31:10, 33:19, 36:13, 38:8, 40:17, 42:2, 42:8, 42:20, 56:25, 57:2
**arrangements** [4] - 28:21, 28:25, 38:22, 46:17
**ASD** [3] - 1:7, 2:19, 4:19
**aside** [1] - 9:16
**aspects** [2] - 31:9, 56:24
**aspirin** [1] - 24:3
**assistance** [6] - 21:11, 21:13, 21:15, 21:20, 21:22, 54:18
**associate** [1] - 4:22
**assume** [1] - 52:25
**assumed** [3] - 31:13, 36:17, 50:17
**assuming** [1] - 41:9
**Atlanta** [1] - 1:19
**Atlantic** [1] - 1:18
**auction** [2] - 54:9, 54:13

**August** [4] - 42:11, 42:15, 47:5, 55:11
**available** [9] - 7:12, 7:22, 13:8, 20:12, 25:3, 37:24, 42:15, 42:22, 44:10
**Avenue** [2] - 1:15, 2:4
**avenue** [1] - 13:24
**avoid** [1] - 51:24
**avoidance** [1] - 25:1
**aware** [1] - 38:7

**B**

**bad** [1] - 51:25
**balance** [1] - 18:13
**bamboozled** [1] - 33:4
**based** [3] - 14:13, 22:24, 24:25
**become** [1] - 31:23
**becoming** [1] - 31:21
**bed** [1] - 24:1
**beginning** [1] - 31:2
**behalf** [6] - 4:1, 4:4, 4:7, 4:12, 5:6, 45:20
**belt** [1] - 32:22
**benefit** [10] - 16:12, 19:18, 20:7, 21:15, 24:3, 24:7, 24:8, 24:9, 25:13, 52:21
**benefits** [1] - 21:22
**Benkowitz** [1] - 27:14
**BENNETT** [5] - 2:8, 3:15, 6:2, 57:17, 57:25
**Bennett** [1] - 4:14
**BERG** [1] - 2:7
**Berg** [1] - 4:15
**best** [7] - 22:18, 22:20, 22:24, 23:5, 23:19, 58:4
**better** [2] - 16:9, 25:16
**between** [7] - 18:22, 23:10, 40:17, 52:15, 56:16, 56:25, 57:3
**beyond** [1] - 31:25
**bid** [1] - 54:9
**Bird** [3] - 4:7, 4:9, 45:20
**BIRD** [2] - 1:14, 1:17
**blame** [2] - 12:2, 26:1
**BLANK** [1] - 2:11
**Blank** [2] - 4:12, 4:15
**block** [6] - 26:7, 27:17, 46:2, 46:17, 48:19, 53:7
**blocked** [5] - 25:4, 26:19, 26:23, 49:2, 51:3
**blocking** [6] - 27:2,

48:21, 51:5, 51:22, 52:9, 52:18
**board** [1] - 24:14
**BONANNO** [1] - 2:4
**Bonanno** [1] - 4:3
**bottom** [1] - 51:5
**box** [1] - 10:14
**Boyle** [5] - 4:18, 37:16, 37:20, 41:17, 41:22
**BOYLE** [4] - 2:16, 4:18, 41:22, 45:17
**brand** [5] - 15:13, 21:3, 45:4, 45:7, 45:10
**branded** [2] - 10:3, 37:2
**breach** [1] - 50:17
**breakup** [1] - 38:24
**BRIAN** [2] - 1:12, 3:2
**brief** [4] - 6:5, 47:11, 48:21, 55:9
**briefly** [1] - 39:6
**bring** [4] - 22:14, 44:4, 51:11, 52:9
**brings** [1] - 18:24
**brought** [3] - 25:5, 35:8, 51:8
**Building** [1] - 1:9
**built** [2] - 24:20, 36:19
**bulk** [1] - 32:18
**burn** [2] - 32:5
**business** [3] - 31:21, 36:19, 42:18
**but-for** [3] - 16:7, 16:8, 43:1
**buy** [1] - 18:3
**buying** [1] - 28:7
**BY** [6] - 1:15, 1:18, 2:2, 2:7, 2:11, 2:16

**C**

**CADD** [2] - 39:12, 44:14
**Calamari** [1] - 4:3
**CALAMARI** [1] - 2:3
**calculable** [1] - 35:10
**candid** [1] - 27:15
**cannot** [4] - 20:23, 21:19, 26:6, 49:3
**capable** [2] - 5:9, 39:23
**cares** [1] - 16:20
**Carl** [1] - 42:16
**Carnegie** [1] - 2:13
**cartridge** [25] - 9:20, 13:21, 13:22, 14:4, 17:16, 29:17, 30:7, 32:7, 35:25, 38:6,

38:10, 39:3, 39:4, 42:4, 42:24, 43:16, 44:9, 44:16, 49:7, 49:21, 49:24, 50:2, 51:4, 53:4
**cartridges** [84] - 7:10, 7:12, 7:16, 8:7, 8:13, 9:20, 11:17, 13:2, 14:2, 14:3, 15:2, 16:14, 17:11, 17:13, 17:15, 17:19, 17:21, 17:22, 17:25, 18:3, 18:9, 24:10, 26:15, 26:21, 27:1, 27:9, 27:12, 27:22, 27:23, 29:2, 31:4, 31:11, 32:5, 32:8, 32:13, 32:15, 32:18, 32:19, 32:21, 33:1, 33:8, 33:9, 33:12, 33:18, 33:20, 36:16, 40:19, 42:6, 42:13, 42:15, 42:21, 43:12, 44:12, 46:14, 46:24, 47:17, 48:2, 48:3, 48:6, 48:17, 48:24, 49:3, 49:21, 51:6, 51:22, 52:24, 53:1, 53:4, 53:20, 53:21, 53:24, 54:5, 54:7, 54:8, 54:11, 54:15, 55:23, 55:24, 56:3, 56:12, 56:14, 57:20
**case** [29] - 13:6, 17:5, 18:15, 20:24, 23:23, 23:24, 24:1, 25:16, 26:25, 27:15, 31:23, 34:3, 34:18, 34:19, 35:23, 36:14, 39:9, 39:25, 42:1, 42:7, 46:2, 49:6, 49:9, 49:15, 49:18, 50:19, 53:9, 54:23, 57:16
**cases** [4] - 14:10, 18:18, 21:25, 34:24
**cell** [1] - 4:25
**Center** [2] - 1:18, 2:13
**certain** [2] - 10:9, 37:8
**certainly** [3] - 30:8, 30:9, 52:16
**certainty** [1] - 55:19
**CERTIFICATE** [1] - 59:1
**certify** [1] - 59:4
**chain** [1] - 36:20
**challenges** [1] - 14:11
**chambers** [2] - 3:10, 3:18
**chance** [2] - 48:10, 55:15

**change** [1] - 3:5
**changed** [2] - 13:13, 13:15
**charges** [1] - 31:12
**charging** [1] - 26:3
**cheaper** [2] - 46:3, 51:8
**check** [3] - 10:14, 10:21, 11:9
**chin** [1] - 45:2
**choice** [3] - 25:14, 35:13, 35:15
**choose** [1] - 18:22
**chose** [1] - 51:13
**Chris** [1] - 43:4
**Christina** [1] - 4:20
**CHRISTINA** [1] - 2:17
**CHRISTOPHER** [1] - 2:7
**Christopher** [1] - 4:15
**cite** [3] - 13:5, 47:10, 50:4
**cited** [3] - 39:2, 48:21, 56:1
**CIVIL** [1] - 1:3
**claim** [3] - 34:16, 36:4, 38:6
**claiming** [4] - 34:23, 34:25, 35:5, 36:10
**clairvoyant** [1] - 29:9
**clause** [2] - 50:24, 57:7
**clear** [8] - 20:10, 32:4, 40:15, 42:5, 43:25, 44:20, 48:20, 50:21
**cleared** [2] - 39:18, 39:19
**clearing** [1] - 39:19
**clearly** [4] - 19:1, 34:24, 36:24, 42:19
**CLERK** [2] - 28:2, 58:6
**client** [13] - 4:9, 5:18, 7:15, 12:22, 18:3, 18:5, 18:10, 18:11, 28:25, 31:3, 32:3, 32:20, 47:19
**client's** [2] - 6:13, 13:2
**clients** [3] - 4:4, 6:8, 18:2
**clock** [1] - 27:21
**close** [1] - 14:25
**closely** [1] - 33:7
**closing** [1] - 57:13
**co** [4] - 22:1, 45:8, 52:2, 52:13
**co-conspirator** [1] - 52:13
**co-counsel** [2] - 22:1, 2:2
**co-pay** [1] - 45:8

**coercive** [3] - 48:8, 51:25, 56:8
**colleagues** [1] - 4:13
**comfortable** [1] - 17:19
**coming** [2] - 39:11, 39:12
**Commencing** [1] - 1:11
**commercially** [1] - 33:14
**commitment** [1] - 38:10
**committed** [2] - 44:11
**companies** [9] - 10:6, 15:14, 21:9, 24:13, 24:22, 35:22, 41:7, 51:12
**company** [11] - 9:16, 36:21, 37:4, 38:13, 38:14, 38:23, 38:24, 38:25, 39:10, 41:10, 47:2
**compare** [1] - 43:21
**compensable** [2] - 34:23, 36:5
**compete** [2] - 16:9, 25:25
**competing** [1] - 18:20
**competition** [9] - 18:24, 24:7, 24:9, 46:17, 52:8, 52:18, 52:23, 53:8
**competitive** [2] - 52:17, 57:5
**competitor** [5] - 37:9, 37:10, 41:11, 52:7
**complain** [1] - 34:13
**complaining** [1] - 31:8
**complaint** [1] - 27:6
**completely** [2] - 27:2, 56:11
**complex** [1] - 55:20
**complicit** [1] - 8:2
**component** [1] - 16:3
**computer** [1] - 1:25
**computer-aided** [1] - 1:25
**concede** [1] - 35:4
**concern** [1] - 11:16
**conclude** [1] - 15:25
**concludes** [1] - 58:7
**condemn** [1] - 57:1
**condition** [1] - 23:18
**conduct** [10] - 8:6, 12:9, 26:7, 26:19, 31:23, 46:2, 51:6, 51:25, 52:17, 52:22
**conference** [1] - 18:6
**confidential** [1] - 12:4

confidentiality [1] -
5:15
confirm [1] - 50:5
confirmed [1] - 47:5
conflate [1] - 52:24
connection [2] - 36:5,
42:17
CONNOLLY [1] - 2:6
Connolly [1] - 4:14
consequences [1] -
35:19
consider [2] - 23:24,
23:25
consideration [1] -
6:19
consistent [1] - 53:2
conspirator [1] -
52:13
consulted [1] - 18:5
CONT'D [1] - 2:1
contemporaneous [4]
- 31:16, 40:15, 56:1,
57:2
contest [1] - 6:6
continue [7] - 26:7,
31:15, 36:14, 43:8,
43:16, 43:23, 48:6
continued [1] - 51:20
continues [3] - 11:12,
15:18, 16:4
contract [6] - 14:24,
26:23, 38:8, 48:22,
56:16
contracted [3] - 38:5,
38:13, 38:14
contracts [4] - 7:8,
12:7, 26:25, 56:19
contractual [2] - 15:5,
52:15
contractually [1] -
44:10
control [4] - 6:24,
17:4, 17:6, 17:7
conversation [2] - 3:7,
3:18
copies [2] - 5:4, 5:12
core [1] - 12:15
corner [1] - 13:1
Corporation [2] -
2:10, 4:13
CORPORATION [1] -
1:7
correct [4] - 6:23, 7:1,
19:4, 59:4
correctly [1] - 46:19
cost [9] - 19:2, 20:11,
21:5, 25:11, 39:1,
39:3, 40:3, 40:9,
51:8
costs [2] - 51:11,

54:24
counsel [18] - 3:12,
3:17, 4:2, 4:21, 4:22,
4:24, 22:1, 33:22,
35:8, 35:17, 42:10,
46:6, 47:23, 52:2,
52:12, 55:4, 57:12,
58:3
counsel's [1] - 44:25
counteracts [1] -
21:21
countries [1] - 39:17
country [1] - 39:20
couple [4] - 30:17,
37:14, 37:22, 56:23
course [3] - 3:15,
31:18, 36:21
COURT [102] - 1:1,
3:4, 3:9, 3:13, 3:17,
4:5, 4:17, 4:23, 5:2,
5:5, 5:11, 5:20, 5:24,
6:1, 6:4, 6:7, 6:15,
6:21, 6:24, 7:2, 7:6,
7:13, 7:15, 7:20,
7:23, 8:14, 8:23,
8:25, 9:3, 9:13, 9:15,
9:24, 10:13, 11:20,
11:23, 11:25, 12:20,
13:24, 14:14, 14:16,
15:21, 15:24, 16:13,
16:17, 16:25, 17:2,
17:6, 17:10, 17:22,
17:24, 18:6, 18:25,
19:6, 19:10, 19:16,
20:1, 20:10, 20:18,
21:1, 21:7, 22:8,
22:13, 27:24, 28:1,
28:2, 28:3, 28:11,
28:14, 28:16, 28:19,
28:23, 29:4, 29:11,
30:6, 30:22, 31:20,
32:14, 33:21, 34:18,
35:8, 36:23, 39:10,
39:14, 40:7, 41:19,
41:21, 45:16, 45:19,
45:23, 47:19, 52:4,
55:1, 55:3, 55:7,
57:12, 57:18, 57:21,
57:24, 58:1, 58:3,
58:6, 59:1
Court [9] - 1:23, 46:1,
46:4, 46:10, 50:6,
50:16, 51:25, 58:7,
59:12
court [6] - 3:1, 5:17,
14:12, 19:25, 38:14,
40:6
Courthouse [1] - 1:9
courtroom [2] - 4:20,
33:21

cover [1] - 41:16
covered [3] - 10:7,
22:2, 41:15
created [1] - 49:11
creating [1] - 49:2
critical [6] - 37:25,
46:10, 47:7, 50:3,
50:16, 50:19
cross [1] - 31:22
CRR [1] - 59:11
crux [1] - 46:20
curious [1] - 35:8
customers [9] - 16:11,
30:8, 33:20, 42:13,
42:14, 46:22, 47:3,
47:8, 48:24
customize [1] - 39:9
cut [1] - 21:16
CVS [8] - 6:18, 13:12,
26:25, 47:10, 47:12,
48:5, 50:10

## D

damage [1] - 34:18
damages [2] - 16:2,
34:24
Darbee [1] - 4:16
DARBEE [1] - 2:12
Date [1] - 59:12
date [5] - 6:10, 14:25,
29:23, 38:18, 57:14
day-to-day [1] - 11:8
days [2] - 57:14, 57:17
DC [2] - 2:9, 2:19
deadly [1] - 23:18
deal [1] - 32:20
debate [1] - 8:8
debating [1] - 35:18
December [4] - 1:10,
3:2, 55:17, 59:11
decided [3] - 43:2,
51:18, 56:5
decision [9] - 22:23,
35:20, 36:3, 36:7,
36:11, 51:15, 51:16,
51:17
decisions [2] - 22:24,
34:6
deck [1] - 45:7
declaration [4] -
24:16, 42:16, 42:19,
43:5
deceased [1] - 20:4
decreasing [1] - 20:5
deems [1] - 21:21
Defendant [3] - 2:10,
2:14, 2:19
defendant's [3] - 17:4,
46:1, 46:5

Defendants [1] - 1:8
defendants [26] -
5:13, 5:14, 6:6, 7:24,
8:9, 8:12, 13:4, 16:6,
16:22, 19:24, 22:25,
23:21, 25:5, 25:9,
25:24, 26:19, 27:8,
45:12, 46:12, 47:23,
49:12, 50:12, 51:25,
52:18, 52:23, 53:6
delay [2] - 13:17,
50:22
delayed [1] - 55:16
deliver [2] - 7:22,
14:20
delivering [1] - 6:22
delivery [14] - 8:15,
8:16, 8:20, 22:15,
30:2, 30:19, 31:2,
32:16, 34:1, 39:11,
50:24, 50:25, 57:8,
57:9
demonstrate [2] -
34:21, 56:2
demonstrates [3] -
32:3, 33:16, 36:6
denial [1] - 56:13
deny [1] - 45:12
depose [1] - 56:20
deposition [1] - 43:6
depositions [2] -
34:12, 34:14
deprived [1] - 41:3
depriving [1] - 33:25
DEPUTY [1] - 28:2,
58:6
describing [1] - 34:7
designated [1] - 48:24
designed [1] - 27:17
desperately [1] - 6:18
despicable [1] - 26:13
determination [2] -
22:17, 23:19
determine [1] - 24:23
detriment [1] - 52:19
devastating [1] - 26:1
develop [1] - 50:13
developed [1] - 50:25
developing [1] - 39:1
Development [1] -
30:12
development [1] -
44:18
device [1] - 50:14
Device [1] - 30:12
devices [3] - 44:7,
50:25
different [2] - 11:19,
54:5
difficult [1] - 23:6

diligence [6] - 13:17,
15:4, 25:6, 46:18,
46:19, 47:8
diligent [3] - 45:25,
46:8, 49:13
diminishing [1] -
15:19
diminution [1] - 11:7
direct [1] - 41:11
direction [1] - 47:22
directly [4] - 25:21,
30:3, 50:22
Director [1] - 30:12
disaggregation [1] -
57:4
discontinue [3] - 43:3,
54:4, 54:5
discontinued [4] -
33:14, 42:5, 44:3,
44:5
discontinuing [1] -
29:2
discounts [1] - 34:4
discovery [9] - 12:4,
19:22, 20:21, 21:23,
27:5, 27:20, 34:13,
38:19, 53:10
discuss [1] - 14:23
discussed [2] - 25:7,
41:1
discussion [1] - 18:12
discussions [1] - 7:8
disincentivized [1] -
41:8
dismiss [1] - 45:14
dispense [6] - 10:15,
10:23, 11:6, 11:10,
27:1, 53:23
dispensed [2] - 10:21,
13:9
dispensing [1] - 39:23
dispute [4] - 16:2,
19:8, 52:6, 52:7
disputed [1] - 30:14
distinct [1] - 24:6
distractions [1] -
54:16
distribution [1] -
36:19
District [1] - 3:2
DISTRICT [3] - 1:1,
1:1, 1:12
diversion [1] - 51:24
divide [1] - 21:4
docket [1] - 3:21
doctors [5] - 10:14,
10:21, 11:5, 15:14,
24:5
documents [3] -
27:16, 38:17, 56:1

dollar [1] - 54:12
dollars [4] - 12:17, 26:5, 40:4, 43:13
done [8] - 25:6, 26:18, 38:3, 38:4, 40:2, 49:21, 49:22
doorstep [1] - 37:8
double [1] - 17:25
doubt [1] - 18:3
Douglass [1] - 4:15
DOUGLASS [1] - 2:8
down [6] - 19:20, 20:8, 25:20, 41:24, 44:19, 55:17
downsides [2] - 23:15, 23:17
Dr [1] - 30:11
drug [35] - 6:17, 6:25, 7:5, 7:11, 7:22, 11:19, 13:14, 19:1, 19:2, 19:3, 19:4, 20:11, 20:12, 20:13, 20:23, 22:10, 23:19, 29:17, 29:20, 30:19, 30:21, 30:24, 33:11, 33:23, 33:24, 34:1, 36:24, 37:5, 41:4, 44:4, 44:6, 46:21, 46:24, 48:25, 49:2
drugmaker [1] - 50:13
drugs [7] - 6:21, 7:10, 10:7, 10:9, 18:21, 21:12, 36:25
due [1] - 55:15

**E**

early [1] - 33:10
economic [2] - 57:4, 57:5
economics [1] - 43:22
economist [1] - 45:2
ecosystem [2] - 10:16, 11:3
Edward [1] - 4:14
EDWARD [1] - 2:8
effect [1] - 40:21
effective [1] - 22:13
effectively [1] - 51:3
effects [1] - 57:6
efficiency [1] - 24:23
efficient [1] - 37:10
effort [3] - 45:25, 47:22, 51:24
efforts [2] - 46:2, 48:18
either [2] - 22:13, 33:25
email [4] - 30:11, 30:13, 55:11, 55:19

emails [1] - 47:15
EMANUEL [1] - 2:2
emphasis [1] - 34:14
employees [3] - 35:1, 41:3, 50:5
end [18] - 13:5, 18:19, 30:9, 42:11, 42:14, 47:24, 47:25, 48:2, 49:13, 49:15, 52:25, 53:3, 53:4, 53:5, 55:22, 57:14
end-of-life [12] - 13:5, 42:11, 42:14, 47:24, 47:25, 48:2, 49:13, 49:15, 53:3, 53:5, 55:22
ended [1] - 43:10
engage [1] - 31:15
engaged [2] - 52:14, 54:6
engaging [1] - 52:17
enjoy [1] - 58:4
ensure [4] - 29:1, 31:1, 31:3, 32:20
ensuring [1] - 33:2
enter [1] - 21:14
entered [2] - 14:16, 49:16
entering [5] - 19:23, 20:6, 27:18, 42:2, 51:3
enters [2] - 20:24, 22:1
entire [1] - 11:1
entitled [1] - 59:5
entitlement [1] - 57:7
entry [3] - 19:18, 24:17, 29:23
environment [1] - 45:4
equally [1] - 37:10
ESQUIRE [18] - 1:15, 1:18, 2:2, 2:3, 2:3, 2:4, 2:7, 2:7, 2:8, 2:8, 2:11, 2:12, 2:12, 2:16, 2:16, 2:17, 2:17, 2:18
essence [1] - 49:14
essentially [1] - 39:22
Ethan [2] - 4:2, 5:6
ETHAN [1] - 2:2
ethically [1] - 51:17
event [4] - 28:7, 33:15
eventually [1] - 14:2
evidence [26] - 5:16, 12:14, 19:22, 20:19, 20:22, 21:23, 24:15, 31:17, 32:2, 34:2, 34:10, 34:25, 40:15, 41:2, 41:4, 41:5, 43:4, 43:7, 43:17,

46:7, 48:20, 54:1, 54:2, 55:21, 57:3, 57:6
exactly [10] - 19:13, 22:16, 25:23, 26:11, 26:12, 27:15, 29:8, 32:24, 47:2, 54:19
example [2] - 9:18, 11:18
except [1] - 53:21
exception [1] - 5:18
exclude [1] - 7:25
exclusive [4] - 15:12, 31:10, 33:19, 40:16
exclusivity [10] - 14:8, 14:9, 14:12, 15:8, 15:11, 25:18, 26:15, 35:9, 36:2, 40:22
excuse [1] - 52:17
executed [1] - 56:17
Exhibit [6] - 47:5, 47:11, 47:15, 48:21, 50:10, 50:21
exist [2] - 42:8, 53:25
existed [2] - 57:2, 57:3
expands [2] - 20:25, 22:2
expansion [1] - 22:2
expect [3] - 14:2, 15:4, 47:2
expected [1] - 14:23
expects [1] - 47:6
expense [2] - 43:18, 43:19
expensive [1] - 55:20
expert [1] - 45:3
experts [2] - 39:9, 39:25
expired [2] - 15:9
explain [2] - 9:21, 24:11
explanations [1] - 35:14
expressed [2] - 31:16, 31:18
expressly [3] - 29:16, 30:1, 36:7
extend [2] - 26:7, 42:3, 53:7
extended [1] - 32:22
extent [3] - 32:10, 34:21, 55:24
extract [1] - 48:18
extreme [3] - 27:7, 48:8, 56:8
extremely [1] - 56:10

**F**

fact [22] - 7:24, 9:16,

13:2, 21:13, 31:8, 32:12, 37:7, 38:7, 39:6, 40:16, 41:1, 41:2, 44:3, 46:13, 48:2, 48:4, 49:9, 50:14, 53:4, 54:8, 54:18, 56:15
factor [1] - 20:5
factors [1] - 16:1
factory [1] - 6:25
facts [3] - 45:3, 49:10, 53:2
Fahmy [1] - 4:20
FAHMY [1] - 2:17
failed [1] - 6:6
fair [1] - 56:21
faith [1] - 15:2
far [3] - 28:24, 39:11, 39:12
fault [11] - 7:15, 7:18, 8:8, 8:10, 8:11, 8:19, 9:6, 9:8, 11:25, 12:13, 54:12
FDA [1] - 39:19
February [1] - 56:4
FEDERAL [1] - 59:1
few [4] - 37:17, 38:15, 41:23, 52:5
fiction [1] - 13:11
fight [1] - 31:12
fighting [1] - 39:5
figure [3] - 44:17, 49:25, 53:10
figures [1] - 34:4
filed [2] - 26:25, 29:16
filer [1] - 14:10
fill [2] - 10:10, 17:15
filled [1] - 17:14
final [1] - 45:11
finally [4] - 33:17, 38:12, 50:8, 53:24
financial [1] - 35:19
fine [1] - 57:25
first [17] - 3:4, 13:11, 13:12, 14:9, 27:3, 30:18, 33:8, 34:3, 35:11, 35:13, 40:11, 46:7, 49:16, 49:23, 53:25, 55:10
fiscal [1] - 43:9
five [2] - 41:25, 57:13
five-page [1] - 57:13
fixed [1] - 53:8
Flolan [1] - 11:19
fluctuate [2] - 32:9, 32:10
fluctuations [1] - 33:1
flying [1] - 40:19
focus [2] - 42:7, 57:16
focused [1] - 6:19

follow [2] - 44:24, 49:10
following [3] - 29:22, 36:6, 40:5
FOR [1] - 1:1
force [1] - 27:9
forecasts [2] - 32:3, 32:4
foregoing [1] - 59:4
foresight [2] - 29:5, 41:8
formularies [2] - 9:9, 11:4
formulary [5] - 10:7, 10:18, 11:11, 24:12, 25:2
forth [1] - 46:13
forward [6] - 6:11, 6:12, 29:5, 31:20, 44:6, 49:14
forward-thinking [1] - 31:20
fought [1] - 29:6
four [1] - 36:13
four-year [1] - 36:13
fraction [2] - 40:4, 40:8
franchise [1] - 25:25
frankly [2] - 34:3, 40:4
Fred [1] - 4:19
FREDERICK [1] - 2:18
free [3] - 23:5, 46:12, 49:14
free-riding [1] - 46:12
fruits [1] - 41:12
fulfilled [1] - 56:12
functionality [1] - 44:15
furthered [1] - 41:7
future [4] - 11:16, 29:10, 41:9, 48:4

**G**

GA [1] - 1:19
gain [1] - 35:24
gaining [1] - 16:10
gee [1] - 37:11
general [2] - 4:21, 4:2
generally [1] - 32:7
generation [1] - 32:24
generic [4] - 6:16, 6:20, 9:8, 9:9, 9:11, 9:25, 10:2, 10:3, 10:11, 11:15, 15:12, 16:24, 17:19, 18:23, 18:24, 19:18, 20:24, 21:25, 22:1, 24:15, 24:21, 28:6, 28:8,

36:9, 37:2, 37:5, 37:7, 42:22, 44:1, 44:21, 45:4, 45:10, 46:3, 46:17, 48:19, 48:25, 49:2, 49:4, 50:12, 51:3, 51:8
**generics** [4] - 15:10, 15:13, 26:8, 32:12
**gerrymandered** [1] - 42:25
**given** [4] - 36:20, 36:21, 37:12, 38:20
**glad** [1] - 41:16
**GLASS** [64] - 2:2, 3:8, 4:1, 4:25, 5:3, 5:6, 5:12, 5:21, 5:25, 6:5, 6:9, 6:16, 6:23, 7:1, 7:4, 7:7, 7:14, 7:17, 7:21, 8:3, 8:21, 8:24, 9:1, 9:4, 9:14, 9:18, 10:5, 10:14, 11:22, 11:24, 12:3, 12:24, 13:25, 14:15, 14:21, 15:23, 15:25, 16:15, 16:18, 17:1, 17:3, 17:7, 17:11, 17:23, 18:1, 18:8, 19:5, 19:7, 19:11, 19:17, 20:2, 20:16, 20:19, 21:2, 21:8, 22:9, 22:16, 32:17, 52:3, 52:5, 55:2, 57:19, 57:22, 58:2
**glass** [6] - 46:6, 46:21, 48:10, 48:12, 51:9, 52:2
**Glass** [2] - 4:2, 5:6
**global** [1] - 43:6
**goodwill** [1] - 6:14
**gosh** [1] - 13:15
**grant** [1] - 45:14
**granted** [2] - 14:9, 16:5
**grantee** [1] - 15:11
**grants** [1] - 16:8
**great** [3] - 25:17, 26:2, 47:21
**GRETCHEN** [1] - 2:16
**Gretchen** [1] - 4:20
**gross** [2] - 19:19, 42:25
**guarantee** [1] - 6:19
**guess** [4] - 29:4, 40:23, 40:24, 57:10

## H

**half** [3] - 3:21, 40:3
**hand** [5] - 8:9, 8:11, 16:5, 27:25, 47:22

**handle** [1] - 47:18
**hands** [1] - 14:17
**HANSEN** [1] - 2:17
**Hansen** [1] - 4:22
**happy** [1] - 14:6
**hard** [2] - 24:11, 49:10
**harm** [12] - 6:7, 6:10, 6:11, 6:12, 6:13, 6:14, 34:8, 35:5, 35:6, 36:4, 36:9, 36:12
**harmed** [1] - 36:15, 36:22, 41:2
**harming** [1] - 9:15
**harms** [1] - 18:13
**Hatch** [4] - 14:10, 30:15, 30:16, 30:18
**Hatch-Waxan** [4] - 14:10, 30:15, 30:16, 30:18
**head** [1] - 42:18
**healthcare** [1] - 25:21
**heard** [8] - 13:18, 30:18, 37:15, 37:24, 52:12, 52:23, 53:16, 53:19
**HEARING** [1] - 1:6
**hefty** [1] - 18:3
**held** [1] - 3:1
**hello** [1] - 52:3
**help** [7] - 3:7, 21:12, 23:23, 24:1, 44:13, 44:17, 44:19
**high** [2] - 30:23, 42:25
**higher** [2] - 19:2, 20:11
**highlighted** [1] - 47:6
**history** [1] - 28:4
**hit** [1] - 50:15
**hold** [1] - 25:15
**holidays** [1] - 58:4
**honor** [1] - 40:20
**Honor** [111] - 3:8, 3:11, 3:15, 4:1, 4:6, 4:11, 4:13, 4:18, 4:25, 5:3, 5:6, 5:8, 5:14, 5:25, 6:2, 6:5, 6:9, 6:10, 6:23, 7:1, 8:3, 8:5, 12:5, 12:25, 13:18, 13:25, 14:5, 14:7, 14:10, 14:15, 15:2, 15:3, 15:8, 15:23, 15:25, 16:8, 16:15, 18:1, 18:5, 18:8, 18:13, 19:5, 19:11, 20:17, 20:21, 20:22, 21:24, 22:16, 23:21, 25:3, 25:7, 25:16, 25:22, 26:5, 26:16, 27:3, 27:4,

27:19, 27:20, 27:23, 27:25, 28:10, 28:13, 29:8, 29:25, 30:18, 31:7, 32:2, 33:10, 34:3, 36:5, 36:15, 36:22, 37:4, 37:15, 37:20, 38:7, 40:12, 40:14, 41:13, 41:16, 41:20, 41:22, 43:7, 44:15, 45:11, 45:13, 45:18, 45:24, 46:19, 47:21, 48:11, 48:20, 49:9, 50:15, 51:23, 52:1, 52:3, 53:17, 54:2, 54:6, 54:23, 55:2, 55:5, 55:9, 56:9, 57:11, 57:19, 57:23, 58:2
**Honor's** [1] - 27:4
**HONORABLE** [1] - 1:12
**Honorable** [1] - 3:1
**hook** [1] - 52:14
**hopefully** [1] - 57:15
**horrible** [1] - 57:14
**hour** [1] - 3:21
**huge** [2] - 39:3, 48:16
**hundred** [2] - 21:15, 26:18
**hundreds** [1] - 43:12
**hurt** [1] - 7:4

## I

**idea** [6] - 9:11, 13:10, 27:14, 27:16, 50:12, 55:18
**ignored** [1] - 44:5
**immediately** [2] - 49:24, 49:25
**imminent** [1] - 14:3
**impact** [1] - 48:15
**impaired** [1] - 52:9
**impediments** [1] - 15:6
**imperfect** [1] - 25:14
**implore** [1] - 27:3
**importance** [1] - 34:15
**important** [10] - 10:6, 18:9, 18:13, 21:18, 30:16, 48:24, 49:17, 51:10, 54:14, 54:23
**importantly** [4] - 23:16, 23:18, 27:22, 31:14
**imposed** [1] - 53:22
**improved** [1] - 21:14
**inability** [1] - 24:18
**INC** [2] - 1:3, 1:7
**Inc** [5] - 1:16, 1:20,

2:19, 4:7, 45:21
**increased** [1] - 20:4
**increasing** [1] - 20:6
**incredible** [2] - 52:10, 54:25
**incrementally** [2] - 12:18, 15:19
**incumber** [1] - 15:1
**indefinitely** [1] - 43:2
**indicating** [1] - 3:21
**indisputably** [1] - 29:13
**inflicted** [1] - 35:12
**infusion** [1] - 44:14
**inhaled** [5] - 22:12, 22:19, 22:22, 23:3, 24:5
**inherent** [1] - 22:14
**initial** [2] - 46:20, 50:7
**inject** [1] - 29:17
**injections** [1] - 22:21
**INJUNCTION** [1] - 1:5
**injunction** [10] - 6:13, 9:19, 16:5, 16:7, 16:8, 17:8, 18:18, 25:17, 35:4, 45:13
**injury** [12] - 11:1, 11:12, 12:15, 14:5, 15:10, 15:18, 16:3, 16:6, 16:11, 16:12, 18:14, 18:15
**innocent** [1] - 52:12
**instance** [1] - 44:1
**instances** [3] - 29:14, 29:15, 32:6
**instead** [2] - 20:5, 54:11
**insulin** [1] - 39:21
**insurance** [7] - 10:5, 10:8, 15:14, 21:8, 24:13, 24:22
**insured** [1] - 10:21
**insurer** [1] - 23:8
**insurers** [8] - 10:17, 10:19, 11:10, 11:14, 12:12, 26:17, 34:10, 54:20
**intended** [1] - 26:11
**intending** [1] - 41:16
**intent** [1] - 46:16
**interact** [1] - 11:8
**interaction** [1] - 12:8
**interest** [11] - 18:17, 18:19, 18:20, 18:21, 18:23, 18:25, 40:23, 40:24, 41:7, 41:13
**interested** [4] - 35:23, 35:24, 38:25, 41:18
**interesting** [1] - 35:9
**intermediary** [1] - 10:2

**intravenous** [2] - 22:11, 36:8
**invalid** [1] - 52:16
**invested** [1] - 36:16
**investment** [3] - 31:13, 41:12, 43:24
**investments** [1] - 41:8
**involve** [1] - 40:1
**involved** [3] - 8:21, 32:21, 40:22
**irreparable** [18] - 6:7, 6:10, 6:11, 6:12, 11:1, 11:12, 12:15, 14:5, 15:9, 15:18, 16:3, 16:6, 16:11, 18:14, 18:15, 35:6, 36:4, 36:11
**issue** [4] - 7:11, 11:20, 13:19, 49:24
**issues** [3] - 12:25, 33:23, 55:15
**items** [1] - 29:3
**itself** [2] - 32:18, 39:21
**IV** [22] - 23:10, 23:13, 23:14, 23:17, 24:5, 24:9, 24:12, 24:17, 24:20, 24:24, 24:25, 25:4, 25:10, 25:13, 25:15, 44:14, 51:13, 51:14, 51:19, 51:22, 52:9

## J

**January** [6] - 32:19, 33:8, 33:17, 49:8, 49:22, 49:23
**JENNY** [1] - 1:15
**JERSEY** [1] - 1:1
**Jersey** [1] - 1:10
**job** [1] - 58:4
**joined** [1] - 4:8
**JONATHAN** [1] - 2:7
**Jonathan** [1] - 4:14
**JUDGE** [1] - 1:12
**Judge** [1] - 3:2
**July** [1] - 43:10
**June** [1] - 29:23

## K

**keep** [5] - 5:1, 16:10, 44:1, 47:24, 50:24
**keeping** [1] - 33:24
**KENT** [7] - 1:18, 3:11, 4:6, 45:18, 45:20, 45:24, 47:21
**Kent** [5] - 4:6, 12:24, 45:20, 53:3, 55:10
**kept** [3] - 19:19, 43:1,

44:21
**KILPATRICK** [1] - 2:15
**kind** [4] - 35:2, 37:8, 37:18, 57:4
**kinds** [2] - 23:22, 35:14
**King** [1] - 1:9
**know-how** [1] - 44:18
**knows** [3] - 12:3, 14:11, 31:1
**Kramer** [1] - 4:8
**KRAMER** [1] - 1:15

**L**

**lack** [1] - 15:4
**largest** [1] - 16:19
**last** [3] - 37:10, 52:5, 56:6
**lasted** [1] - 56:4
**late** [7] - 7:8, 13:4, 13:13, 26:24, 28:22, 39:7, 40:13
**launch** [24] - 9:23, 10:18, 14:4, 14:19, 14:24, 15:1, 15:6, 29:20, 30:13, 30:23, 30:24, 36:3, 42:22, 46:9, 47:1, 50:23, 51:13, 51:14, 51:18, 55:16, 55:17, 55:20, 56:5
**launched** [4] - 8:7, 11:2, 25:10, 25:12
**launching** [2] - 14:25, 36:1
**law** [3] - 50:15, 51:17, 57:4
**laws** [2] - 37:9, 52:22
**lawsuit** [4] - 9:13, 9:14, 28:4, 30:15
**lawyers** [1] - 3:13
**leaders** [1] - 30:13
**learned** [5] - 13:11, 13:12, 29:2, 49:23
**least** [2] - 25:13, 57:15
**leave** [1] - 27:12
**left** [1] - 34:12
**legacy** [1] - 44:14
**less** [3] - 22:10, 23:9, 45:9
**letter** [1] - 38:24
**leverage** [1] - 26:22
**liability** [1] - 34:22
**license** [1] - 44:16
**life** [15] - 13:5, 30:9, 42:11, 42:14, 47:24, 47:25, 48:2, 49:13, 49:15, 52:25, 53:3,

53:4, 53:5, 55:22
**lifesaving** [1] - 48:17
**likelihood** [1] - 16:1
**likely** [2] - 22:9, 23:13
**limit** [3] - 50:22, 53:21, 53:22
**limited** [3] - 20:21, 21:24, 34:13
**limits** [1] - 37:19
**line** [4] - 31:22, 41:25, 43:11, 51:5
**litigated** [1] - 21:25
**litigation** [2] - 12:11, 29:23
**lives** [1] - 27:8
**LLC** [2] - 1:3, 2:5
**LLP** [6] - 1:14, 1:17, 2:2, 2:6, 2:11, 4:12
**look** [17] - 14:23, 28:14, 28:17, 29:5, 33:7, 35:17, 40:5, 42:14, 43:6, 43:25, 45:13, 48:2, 48:11, 50:10, 50:18, 54:9, 56:24
**looking** [3] - 16:7, 28:3, 57:1
**looks** [1] - 39:4
**looming** [1] - 12:21
**lose** [1] - 25:25
**losing** [2] - 54:17, 54:19
**lost** [2] - 8:24, 35:10
**lower** [5] - 16:10, 21:12, 23:3, 25:11, 51:8
**lowered** [1] - 45:7
**Luther** [1] - 1:9

**M**

**Madison** [1] - 2:4
**main** [1] - 51:20
**managers** [1] - 43:6
**mandating** [1] - 36:9
**mandatory** [2] - 10:9, 10:20
**manufacture** [2] - 38:9, 50:13
**manufacturer** [1] - 44:7
**manufacturing** [4] - 11:20, 11:23, 38:6, 44:18
**March** [1] - 51:14
**margin** [1] - 19:9
**margins** [2] - 42:24, 42:25
**mark** [1] - 11:5
**marked** [1] - 49:20

**market** [26] - 7:5, 7:25, 13:1, 13:15, 13:23, 17:25, 25:24, 26:20, 27:2, 27:18, 28:6, 28:8, 33:13, 33:25, 36:24, 37:1, 39:11, 39:13, 44:1, 44:4, 44:21, 51:3, 51:9, 51:10, 51:21, 53:1
**marketing** [1] - 42:18
**marketplace** [1] - 48:5
**Martin** [1] - 1:9
**MARTINOTTI** [2] - 1:12, 3:2
**match** [2] - 54:1, 55:21
**math** [2] - 21:3
**matter** [6] - 38:15, 50:14, 50:15, 51:17, 54:22, 59:5
**Matthew** [2] - 4:6, 45:20
**MATTHEW** [1] - 1:18
**maximized** [1] - 54:10
**McKay** [2] - 1:23, 59:11
**McKay-Soule** [2] - 1:23, 59:11
**McKinzie** [1] - 55:14
**mean** [6] - 11:25, 12:1, 18:8, 22:6, 43:12, 57:19
**meaning** [1] - 10:9
**means** [2] - 21:12, 28:8
**meantime** [1] - 28:7
**measures** [1] - 48:8
**mechanical** [1] - 1:25
**mechanism** [3] - 30:20, 37:6, 57:8
**mechanisms** [1] - 57:9
**Medicaid** [2] - 45:5, 54:21
**MEDICAL** [1] - 1:7
**Medical** [4] - 2:19, 4:19, 4:21, 41:23
**Medicare** [2] - 45:5, 54:21
**medication** [1] - 32:17
**medications** [1] - 32:16
**medicines** [1] - 48:17
**meet** [1] - 11:10
**meetings** [1] - 11:9
**Megan** [2] - 1:23, 59:11
**megansoule430@gmail.com** [1] - 1:23
**MEGHAN** [1] - 2:17

**Meghan** [1] - 4:21
**mention** [2] - 37:16, 38:23
**mere** [2] - 19:23, 20:6
**method** [6] - 8:15, 8:16, 8:20, 19:4, 20:13, 34:1
**methods** [1] - 19:3
**MICHAEL** [1] - 2:12
**Michael** [1] - 4:16
**middle** [1] - 41:25
**might** [1] - 35:2
**MIKE** [1] - 2:4
**Mike** [1] - 4:3
**million** [3] - 19:14, 26:5, 40:3
**millions** [2] - 12:17, 43:13
**mind** [1] - 37:20
**MiniMed** [2] - 39:15, 39:16
**minute** [1] - 37:10
**minutes** [3] - 3:22, 41:21, 52:5
**misdirect** [2] - 46:1, 51:24
**misdirection** [1] - 46:1
**miss** [1] - 54:17
**modifications** [1] - 39:23
**modified** [1] - 39:22
**mold** [1] - 43:18
**moment** [1] - 55:6
**monetary** [2] - 16:2, 34:23
**money** [7] - 9:17, 20:9, 34:18, 43:14, 43:15, 54:25
**monopolize** [1] - 53:7
**monopoly** [1] - 51:21
**month** [1] - 56:4
**months** [4] - 9:22, 11:6, 38:15, 40:2
**mooted** [1] - 19:23
**morally** [1] - 51:16
**morning** [5] - 3:4, 3:17, 4:6, 4:11, 45:18
**most** [5] - 23:16, 23:17, 41:15, 48:20, 49:17
**motion** [1] - 45:14
**MR** [99] - 3:8, 3:11, 3:15, 4:1, 4:6, 4:11, 4:18, 4:25, 5:3, 5:6, 5:12, 5:21, 5:25, 6:2, 6:5, 6:9, 6:16, 6:23, 7:1, 7:4, 7:7, 7:14, 7:17, 7:21, 8:3, 8:21, 8:24, 9:1, 9:4, 9:14,

9:18, 10:5, 10:14, 11:22, 11:24, 12:3, 12:24, 13:25, 14:15, 14:21, 15:23, 15:25, 16:15, 16:18, 17:1, 17:3, 17:7, 17:11, 17:23, 18:1, 18:8, 19:5, 19:7, 19:11, 19:17, 20:2, 20:16, 20:19, 21:2, 21:8, 22:9, 22:16, 27:25, 28:10, 28:12, 28:15, 28:18, 28:20, 28:24, 29:8, 29:12, 30:8, 30:23, 31:25, 32:17, 34:2, 34:19, 35:11, 37:3, 39:12, 39:15, 40:8, 41:20, 41:22, 45:17, 45:18, 45:20, 45:24, 47:21, 52:3, 52:5, 55:2, 55:5, 55:8, 57:17, 57:19, 57:22, 57:25, 58:2
**MS®3** [7] - 39:12, 39:21, 41:24, 42:3, 44:2, 48:23
**must** [2] - 23:2, 24:14
**muted** [2] - 24:17, 25:14

**N**

**name** [3] - 4:2, 38:13, 38:23
**Nate** [1] - 43:5
**near** [1] - 11:16
**nearly** [1] - 36:13
**need** [31] - 6:22, 8:15, 9:8, 9:9, 9:21, 10:15, 10:16, 10:17, 10:19, 10:21, 10:22, 17:14, 20:20, 27:21, 29:16, 32:22, 32:23, 33:23, 37:5, 37:11, 37:12, 38:2, 40:13, 47:4, 47:9, 48:14, 50:13, 53:10, 53:18, 55:12
**needed** [5] - 7:9, 40:20, 48:17, 48:18, 55:20
**needs** [3] - 23:16, 27:22, 41:9
**nefarious** [1] - 28:19
**negotiate** [1] - 18:9
**negotiated** [1] - 56:15
**negotiating** [1] - 26:22
**never** [5] - 15:17, 27:7, 27:9, 33:7, 56:17
**NEW** [1] - 1:1
**new** [3] - 43:19, 44:4,

53:12
**New** [3] - 1:10, 1:16, 2:5
**Newark** [1] - 1:10
**next** [2] - 32:24, 49:19
**nine** [3] - 9:22, 11:6, 41:21
**NJ** [1] - 2:13
**nobody** [1] - 12:3
**non** [1] - 16:1
**non-likelihood** [1] - 16:1
**none** [6] - 26:18, 31:6, 33:4, 38:12, 53:13, 53:14
**nonprofit** [1] - 35:22
**normally** [2] - 18:16, 18:17
**note** [4] - 21:18, 29:16, 30:17, 37:25
**noted** [1] - 53:3
**nothing** [6] - 12:10, 29:21, 30:1, 34:11, 45:25
**notice** [22] - 13:5, 13:10, 29:13, 29:15, 30:9, 30:14, 33:15, 37:5, 38:2, 42:11, 42:12, 42:14, 47:24, 47:25, 48:3, 49:13, 49:15, 52:25, 53:3, 53:5, 55:22
**notion** [1] - 53:24
**notwithstanding** [1] - 14:18
**nowhere** [1] - 28:18
**number** [14] - 5:22, 6:19, 18:10, 19:19, 20:25, 21:5, 22:1, 32:10, 34:22, 34:24, 36:20, 38:4, 41:14
**NUMBER** [1] - 1:3
**numbers** [2] - 5:18, 5:22
**NW** [2] - 2:9, 2:18
**NY** [2] - 1:16, 2:5

**O**

**obtain** [1] - 33:11
**obviously** [1] - 37:15
**occur** [3] - 34:25, 35:2, 38:19
**occurred** [3] - 3:16, 28:7, 28:15
**October** [1] - 38:18
**OF** [1] - 1:1
**offer** [2] - 13:22, 24:12
**offered** [2] - 44:13, 44:16

**offering** [1] - 24:11
**offers** [1] - 21:20
**OFFICIAL** [1] - 59:1
**Official** [1] - 1:23
**once** [2] - 17:19, 24:10
**one** [24] - 6:19, 8:9, 10:25, 14:5, 20:17, 22:10, 32:7, 34:21, 34:22, 37:18, 37:25, 39:18, 40:3, 42:23, 43:5, 44:3, 44:20, 44:24, 45:11, 45:22, 49:5, 53:12, 55:19, 56:13
**One** [1] - 1:18
**one-and-a-half** [1] - 40:3
**ones** [2] - 46:23, 49:17
**online** [1] - 32:25
**open** [5] - 3:1, 5:17, 19:25, 38:14, 40:6
**operation** [1] - 40:11
**opportunity** [1] - 37:21
**opted** [1] - 56:20
**optically** [2] - 28:9, 28:17
**option** [2] - 24:18, 53:12
**options** [2] - 39:8, 53:12
**oral** [5] - 20:16, 22:11, 22:22, 23:3, 24:5
**orally** [1] - 5:21
**order** [13] - 3:20, 12:11, 17:13, 17:14, 17:17, 29:17, 37:12, 40:20, 41:9, 48:18, 55:20, 56:11, 56:13
**original** [2] - 32:20, 40:21
**originally** [1] - 39:25
**ORLOFSKY** [2] - 2:11, 4:11
**Orlofsky** [1] - 4:12
**otherwise** [3] - 31:11, 38:9, 50:22
**ourselves** [1] - 25:6
**outbid** [1] - 54:14
**outset** [1] - 56:7
**outside** [3] - 3:11, 27:1, 33:21
**overall** [1] - 57:2
**overpayments** [1] - 12:17
**override** [1] - 10:15
**overt** [1] - 52:14
**own** [7] - 11:25, 17:6, 21:17, 27:13, 35:1, 41:2, 50:14

**owned** [1] - 13:8
**owns** [2] - 16:14, 17:22

**P**

**p.m** [1] - 58:7
**page** [4] - 45:6, 48:22, 50:5, 57:13
**pages** [1] - 50:7
**PAH** [6] - 11:19, 20:20, 23:22, 24:2, 24:3, 24:4
**paid** [5] - 18:4, 21:8, 21:9, 34:5, 34:6
**pain** [2] - 22:20, 23:17
**palatable** [1] - 25:12
**papers** [8] - 7:24, 40:14, 41:14, 48:22, 50:6, 55:14, 56:2, 58:4
**paramount** [1] - 18:19
**Parente** [1] - 4:8
**Park** [1] - 1:15
**part** [8] - 7:23, 9:13, 9:14, 18:14, 19:24, 21:8, 21:9, 55:13
**particular** [3] - 38:11, 40:25, 47:11
**particularly** [1] - 23:2
**parties** [9] - 5:10, 8:21, 9:11, 15:7, 26:17, 40:9, 57:3, 57:9
**partners** [1] - 4:19
**party** [8] - 12:1, 14:1, 14:11, 14:12, 14:21, 14:22, 15:11, 30:3
**past** [2] - 9:22, 32:4
**patent** [7] - 14:11, 26:6, 26:7, 29:22, 50:18, 50:19, 53:7
**patents** [1] - 26:2
**path** [1] - 49:14
**patient** [30] - 6:3, 6:22, 21:6, 21:11, 21:13, 21:15, 21:20, 21:21, 22:14, 22:18, 22:19, 22:25, 23:2, 23:7, 23:16, 24:2, 26:8, 27:8, 30:25, 35:21, 35:22, 41:2, 41:3, 41:4, 45:8, 45:9, 53:18, 54:18
**patient's** [2] - 29:7, 33:1
**patients** [75] - 9:2, 9:10, 11:15, 11:24, 12:13, 12:17, 15:15, 16:20, 16:21, 16:23,

19:7, 19:8, 19:17, 19:20, 20:20, 20:23, 20:25, 21:5, 21:9, 21:12, 21:16, 21:19, 21:21, 22:1, 22:2, 22:6, 22:12, 22:19, 22:20, 22:21, 23:5, 23:22, 24:3, 24:4, 24:9, 25:11, 25:13, 25:19, 25:20, 25:21, 26:17, 27:13, 29:1, 29:6, 31:3, 31:4, 31:19, 31:22, 32:21, 34:5, 36:18, 36:23, 36:25, 37:1, 37:3, 37:7, 38:11, 41:6, 42:1, 46:2, 46:24, 46:25, 48:7, 48:15, 48:16, 48:18, 49:3, 51:9, 52:19, 53:17, 53:23, 54:17, 54:22
**pay** [8] - 21:16, 23:7, 23:8, 45:8, 54:20, 54:21, 54:22
**payers** [12] - 9:9, 10:5, 10:7, 10:8, 12:12, 19:17, 34:6, 34:10, 36:8, 45:5, 52:20
**paying** [3] - 18:12, 41:5, 45:9
**payment** [1] - 25:1
**Peachtree** [1] - 1:19
**Pease** [1] - 4:3
**PEASE** [1] - 2:3
**pennies** [1] - 54:12
**people** [4] - 32:12, 33:23, 44:3, 54:24
**per** [2] - 21:5
**percent** [5] - 19:9, 19:20, 21:16, 26:3, 26:19
**perhaps** [2] - 8:2, 19:2
**period** [8] - 14:8, 14:9, 15:8, 32:22, 38:1, 40:1, 40:2, 53:15
**permission** [1] - 16:23
**permit** [4] - 37:9, 55:5, 57:4, 57:13
**person** [1] - 24:24
**perspective** [4] - 13:2, 13:3, 14:21, 43:9
**persuade** [1] - 9:5
**pertain** [1] - 55:23
**PETER** [2] - 2:3, 2:16
**Peter** [3] - 4:3, 4:18, 41:22
**pharmacies** [45] - 6:18, 7:7, 7:9, 7:18, 7:25, 8:4, 8:9, 8:10, 8:11, 9:5, 9:6, 9:7,

10:22, 10:25, 11:14, 12:5, 13:3, 15:15, 17:17, 17:18, 17:20, 26:13, 26:14, 26:17, 26:22, 27:10, 27:11, 33:5, 34:9, 34:15, 41:6, 46:15, 46:22, 46:23, 48:5, 48:9, 48:13, 49:3, 50:2, 53:22, 54:20, 56:9, 56:16, 56:17, 56:19
**pharmacy** [11] - 8:14, 8:20, 10:1, 10:10, 16:19, 17:12, 38:9, 56:12, 56:21
**phone** [1] - 4:25
**physician** [4] - 22:16, 22:23, 23:1, 23:6
**physicians** [4] - 22:23, 23:4, 23:18, 24:19
**pick** [1] - 3:9
**piece** [1] - 10:25
**pieces** [1] - 43:7
**pill** [1] - 20:16
**Pitt** [2] - 4:14, 44:25
**PITT** [23] - 2:7, 27:25, 28:10, 28:12, 28:15, 28:18, 28:20, 28:24, 29:8, 29:12, 30:8, 30:23, 31:25, 34:2, 34:19, 35:11, 37:3, 39:12, 39:15, 40:8, 41:20, 55:5, 55:8
**place** [7] - 17:13, 29:1, 31:2, 31:25, 46:11, 50:9, 51:7
**placed** [3] - 15:6, 34:15, 56:12
**places** [1] - 17:17
**Plaintiff** [3] - 1:16, 1:20, 2:5
**plaintiff** [3] - 4:7, 5:7, 45:21
**plaintiff's** [2] - 18:23, 44:25
**Plaintiffs** [1] - 1:4
**plaintiffs** [12] - 24:12, 31:5, 35:4, 38:2, 40:10, 42:10, 42:23, 43:13, 43:17, 44:13, 45:1, 53:10
**plan** [3] - 28:19, 32:23, 36:8
**planned** [1] - 37:11
**plans** [2] - 30:23, 36:19
**plant** [1] - 11:23
**plenty** [1] - 54:2
**pocket** [1] - 21:17
**point** [23] - 3:19, 5:22,

11:13, 11:16, 30:6, 32:14, 35:6, 35:9, 36:5, 39:7, 40:12, 41:15, 43:17, 45:11, 47:19, 50:5, 50:16, 55:10, 55:12, 55:22, 56:8
**pointed** [1] - 55:10
**pointing** [1] - 50:24
**points** [9] - 37:14, 37:22, 41:14, 41:18, 41:23, 46:3, 55:6, 56:23, 57:10
**policies** [1] - 10:8
**popular** [1] - 45:22
**population** [3] - 6:3, 26:9, 30:25
**portion** [1] - 16:20
**posed** [1] - 46:5
**position** [4] - 22:25, 23:7, 29:4, 44:6
**positions** [1] - 42:23
**possession** [1] - 13:7
**possibility** [1] - 15:19
**possible** [3] - 22:6, 22:12, 23:24
**power** [2] - 10:4, 29:9
**PowerPoint** [2] - 45:21, 48:11
**precisely** [1] - 49:1
**predict** [1] - 32:25
**preferred** [7] - 19:4, 20:15, 22:3, 22:10, 23:1, 23:9, 34:1
**PRELIMINARY** [1] - 1:5
**preliminary** [4] - 6:13, 18:18, 25:17, 45:12
**premium** [1] - 18:4
**prepare** [1] - 41:9
**prepared** [1] - 57:23
**prescribe** [6] - 9:8, 11:5, 23:1, 23:3, 23:5, 24:21
**prescribed** [2] - 24:24, 24:25
**prescriber** [2] - 9:24, 9:25
**prescribers** [11] - 9:1, 9:8, 9:10, 9:21, 11:8, 11:9, 11:14, 11:24, 24:14, 34:9, 52:20
**prescription** [4] - 9:25, 10:1, 10:10, 10:12
**present** [2] - 4:10, 5:8
**presentation** [4] - 26:11, 47:11, 47:12, 48:12
**presented** [2] - 5:16,

5:17
**preserve** [2] - 25:17, 52:22
**president** [5] - 20:3, 23:12, 26:21, 53:19
**pressure** [1] - 7:25
**pretty** [1] - 40:4
**prevails** [1] - 14:11
**prevent** [2] - 48:25, 50:22
**price** [1] - 5:19, 17:25, 20:4, 20:5, 20:6, 23:3, 34:4, 34:5, 45:2, 54:8
**prices** [2] - 16:10, 34:6
**pricing** [1] - 41:6
**primary** [1] - 57:10
**Princeton** [1] - 2:13
**problem** [16] - 6:22, 7:17, 9:20, 10:24, 11:22, 12:6, 12:15, 25:8, 35:25, 44:7, 44:8, 44:22, 44:23, 47:23, 54:6
**problems** [1] - 56:20
**proceeded** [1] - 28:20
**PROCEEDINGS** [1] - 3:1
**Proceedings** [1] - 1:25
**proceedings** [2] - 42:17, 59:5
**process** [1] - 39:19
**procure** [1] - 47:12
**produce** [5] - 6:25, 8:2, 31:10, 38:16, 46:21
**produced** [2] - 1:25, 31:11
**product** [26] - 8:15, 9:17, 11:4, 14:20, 18:22, 18:23, 18:24, 25:3, 25:15, 30:13, 39:11, 41:24, 42:6, 42:22, 43:3, 43:6, 43:15, 43:22, 43:23, 44:5, 44:17, 44:18, 48:14, 51:11
**production** [4] - 32:7, 42:3, 43:16, 44:10
**products** [4] - 16:10, 42:7, 43:1, 43:8
**profit** [9] - 19:13, 19:15, 19:19, 20:8, 25:20, 26:3, 35:23, 43:11, 52:11
**profitability** [1] - 54:7
**program** [5] - 21:13, 21:15, 21:20, 21:22,

54:18
**programs** [1] - 21:11
**progress** [1] - 3:20
**projected** [1] - 56:6
**promises** [1] - 7:22
**prong** [3] - 18:17, 18:19
**prospect** [1] - 12:18
**protect** [1] - 29:6
**protected** [1] - 29:7
**protective** [1] - 12:11
**prototype** [2] - 38:16, 39:2
**provide** [12] - 16:9, 24:18, 25:10, 37:6, 38:3, 45:22, 46:23, 47:4, 47:7, 47:9, 47:16, 52:1
**provided** [4] - 5:12, 5:17, 46:24, 46:25
**provides** [1] - 30:19
**providing** [2] - 27:5, 27:19
**provision** [2] - 15:5, 30:1
**provisions** [2] - 31:8, 52:15
**public** [17] - 12:10, 18:16, 18:17, 18:19, 18:20, 18:21, 18:23, 18:25, 20:7, 20:9, 20:11, 27:22, 40:23, 40:24, 41:7, 41:13
**publicly** [1] - 12:10
**pump** [18] - 13:5, 13:6, 13:20, 13:22, 30:2, 30:7, 39:16, 39:17, 39:22, 39:25, 42:3, 42:5, 42:11, 44:14, 47:23, 52:25, 55:15
**pumps** [30] - 7:10, 7:12, 7:16, 8:6, 8:12, 13:6, 13:7, 16:13, 16:15, 16:18, 16:21, 16:22, 17:3, 17:9, 29:1, 33:11, 39:8, 46:25, 47:13, 47:16, 47:18, 48:1, 48:6, 49:18, 52:24, 53:12, 54:4, 55:24, 57:8
**purchase** [2] - 17:13, 32:18
**purchasers** [2] - 6:17, 6:18
**purpose** [2] - 40:20, 46:16
**pursuing** [3] - 13:24, 13:25, 46:8
**push** [2] - 9:10, 37:19
**put** [15] - 3:20, 7:24,

9:9, 10:17, 11:10, 23:6, 24:5, 24:16, 26:4, 28:25, 35:21, 43:9, 46:11, 49:8, 54:8
**putting** [1] - 3:22
**puzzle** [1] - 11:1

## Q

**qualify** [1] - 43:19
**quality** [1] - 16:10
**questions** [8] - 14:6, 17:14, 37:16, 41:17, 45:15, 46:5, 46:20
**quick** [4] - 3:18, 12:23, 40:23, 55:5
**quickly** [1] - 57:23
**Quinn** [1] - 43:4
**QUINN** [1] - 2:2
**quotes** [2] - 54:17, 56:10

## R

**raise** [1] - 54:8
**Randall** [1] - 4:21
**RANDALL** [1] - 2:16
**Raregen** [29] - 2:5, 4:2, 4:4, 5:7, 14:22, 16:1, 19:23, 25:12, 26:23, 32:18, 35:18, 45:25, 46:8, 46:21, 47:2, 47:14, 47:17, 48:7, 49:7, 49:23, 51:1, 51:8, 51:13, 51:18, 52:8, 52:19, 54:9, 56:5
**RAREGEN** [1] - 1:3
**RareGen's** [3] - 13:2, 46:18, 50:5
**rate** [3] - 32:5, 32:6, 45:5
**rather** [5] - 22:14, 35:25, 37:1, 37:2, 40:9
**reaching** [2] - 13:20
**react** [1] - 12:23
**reacted** [1] - 12:22
**reading** [1] - 49:10
**real** [1] - 33:23
**realized** [1] - 40:19
**really** [16] - 7:24, 12:21, 22:4, 23:16, 23:23, 25:4, 25:19, 27:21, 38:20, 40:24, 41:15, 44:8, 44:20, 45:2, 52:23, 55:21
**reason** [6] - 12:4, 21:2, 27:11, 41:25,

48:7, 51:15
**reasonable** [1] - 23:25
**reasonably** [1] - 15:4
**reasons** [8] - 32:7, 32:19, 33:2, 34:20, 34:22, 35:13, 37:25, 55:18
**receive** [3] - 9:17, 9:19, 29:19
**received** [1] - 30:9
**recess** [1] - 3:16
**record** [8] - 3:23, 3:24, 34:11, 41:4, 43:20, 43:25, 59:5
**recorded** [1] - 1:25
**recover** [1] - 35:12
**reduce** [2] - 12:18, 51:11
**reference** [2] - 42:10, 57:8
**reflect** [2] - 34:24, 52:6
**reflective** [1] - 32:11
**regardless** [1] - 10:11
**regularly** [1] - 11:8
**reimbursed** [1] - 45:4
**relate** [2] - 48:1, 49:18
**related** [1] - 50:25
**relating** [1] - 5:19
**relationship** [1] - 57:5
**relied** [1] - 36:14
**reluctance** [1] - 15:16
**rely** [1] - 36:14
**remedied** [1] - 6:12
**remedy** [2] - 35:5, 53:11
**Remodulin®** [15] - 17:20, 18:22, 18:24, 19:8, 19:14, 19:19, 24:20, 25:25, 27:1, 39:23, 44:15, 52:7, 53:16, 53:17, 56:5
**repairable** [1] - 35:10
**repeatedly** [2] - 37:5, 38:2
**repertory** [1] - 25:2
**report** [4] - 19:11, 19:12, 45:3, 55:14
**Reporter** [2] - 1:23, 59:12
**REPORTER'S** [1] - 59:1
**reports** [1] - 26:4
**represent** [1] - 21:23
**representatives** [1] - 4:9
**represents** [1] - 37:17
**reputation** [2] - 7:3, 7:4
**reputational** [2] -

34:8, 35:5
**require** [1] - 10:8
**requires** [2] - 48:23, 50:16
**reservoir** [1] - 29:17
**resin** [2] - 43:19, 53:20
**resolution** [1] - 28:5
**resolve** [1] - 13:16
**resolved** [1] - 28:5
**respect** [1] - 42:24
**respectfully** [2] - 19:5, 28:12
**respond** [1] - 55:6
**responded** [1] - 47:18
**response** [3] - 19:22, 30:17, 44:25
**responsive** [1] - 46:4
**rest** [2] - 24:1, 52:1
**restraints** [2] - 11:2, 17:12
**restrict** [2] - 49:20, 50:23
**restricted** [1] - 46:14
**restriction** [5] - 13:4, 49:2, 50:8, 50:9, 56:2
**restrictions** [9] - 46:11, 48:9, 49:7, 49:21, 49:24, 50:2, 51:4, 51:6, 56:6
**result** [1] - 36:8
**retool** [1] - 43:18
**return** [1] - 25:21
**revenue** [5] - 19:13, 19:14, 21:4, 43:11
**revenues** [1] - 43:21
**review** [1] - 54:2
**riding** [2] - 46:12, 49:15
**rise** [1] - 58:6
**risk** [6] - 27:8, 27:13, 31:14, 36:17, 41:10, 48:16
**risks** [2] - 22:14, 41:9
**RMR** [1] - 59:11
**Rogove** [1] - 4:16
**ROGOVE** [1] - 2:12
**Rome** [2] - 4:12, 4:15
**ROME** [1] - 2:11
**room** [1] - 18:7
**route** [4] - 22:17, 23:1, 23:20, 52:10
**routes** [2] - 22:4, 22:5, 22:11
**run** [1] - 26:2

**S**

**salacious** [1] - 48:12

**Sandoz** [47] - 1:16, 1:20, 4:7, 12:25, 14:22, 14:23, 15:4, 16:1, 19:23, 25:12, 26:23, 29:13, 29:15, 30:2, 30:9, 30:12, 30:14, 33:10, 35:18, 44:2, 44:3, 44:5, 45:21, 45:24, 46:8, 46:18, 46:21, 47:1, 47:6, 47:8, 48:7, 49:6, 49:23, 50:4, 50:16, 51:1, 51:7, 51:13, 51:18, 52:9, 52:19, 54:10, 55:14, 55:17, 56:4, 57:22
**SANDOZ** [1] - 1:3
**saw** [3] - 40:19, 48:4, 53:11
**scheme** [1] - 9:12
**screen** [1] - 5:9
**SEAN** [1] - 2:8
**Sean** [1] - 4:14
**seated** [1] - 3:25
**second** [5] - 10:4, 20:17, 24:10, 46:9, 53:6
**secret** [4] - 12:9, 53:7, 53:25, 54:11
**secure** [1] - 10:17
**see** [15] - 11:4, 20:2, 21:5, 26:10, 29:5, 32:11, 33:7, 36:3, 39:3, 43:7, 47:4, 48:3, 54:2, 57:18
**seem** [2] - 42:7, 43:12
**selective** [1] - 56:10
**self** [2] - 35:12, 54:1
**self-inflicted** [1] - 35:12
**self-serving** [1] - 54:1
**sell** [5] - 9:16, 17:21, 17:24, 44:12, 48:23
**selling** [2] - 6:20, 42:6
**Senior** [1] - 30:12
**sense** [4] - 23:14, 31:21, 44:4, 46:13
**sent** [3] - 38:24, 47:15, 47:24
**sepsis** [1] - 23:18
**September** [2] - 38:18, 50:20
**serious** [2] - 18:12, 48:14
**serve** [6] - 25:20, 41:13, 51:9, 53:16, 53:18, 55:24
**service** [3] - 16:21, 31:22, 48:15
**serving** [2] - 53:23,

54:1
**set** [1] - 33:2
**setting** [1] - 46:13
**settle** [1] - 29:22
**settlement** [8] - 14:13, 14:17, 15:7, 30:15, 50:18, 50:19, 50:20, 57:7
**seven** [6] - 38:1, 57:15, 57:17, 57:24, 57:25, 58:1
**seven-year** [1] - 38:1
**severely** [1] - 52:9
**shadow** [1] - 20:6
**shelves** [1] - 40:19
**short** [3] - 3:16, 25:22, 35:24
**short-term** [1] - 35:24
**show** [7] - 5:23, 31:7, 35:16, 40:5, 45:3, 49:5, 50:6
**showing** [2] - 5:16, 45:7
**shows** [9] - 18:8, 27:17, 43:20, 46:8, 46:12, 46:13, 46:16, 54:18, 57:3
**shut** [1] - 55:17
**sick** [2] - 22:21, 23:2
**side** [2] - 3:9, 3:13
**sides** [1] - 6:1
**sign** [3] - 26:15, 26:23, 51:2
**signed** [2] - 26:25, 30:15
**significant** [4] - 11:7, 11:11, 16:20, 48:15
**significantly** [2] - 19:18, 32:6
**simple** [1] - 54:7
**simplicity** [1] - 24:22
**simply** [5] - 34:3, 36:14, 37:13, 41:11, 49:15
**single** [1] - 56:13
**site** [1] - 23:17
**situation** [1] - 45:9
**size** [1] - 6:3
**skeptical** [1] - 7:21
**sleight** [1] - 47:22
**slide** [14] - 19:12, 21:13, 23:11, 24:16, 26:21, 35:16, 35:17, 36:6, 40:5, 45:6, 45:7, 48:11, 49:19, 49:23
**slides** [8] - 5:4, 5:8, 5:12, 5:16, 5:23, 19:21, 26:10, 53:11
**slowly** [1] - 32:8

**small** [2] - 40:4, 40:8
**Smith** [1] - 51:2
**Smith's** [1] - 52:12
**SMITHS** [1] - 1:7
**Smiths** [42] - 2:19, 4:18, 4:21, 13:16, 17:13, 27:17, 29:2, 31:10, 31:14, 36:18, 37:17, 39:24, 40:17, 41:23, 41:24, 42:5, 42:9, 42:14, 42:18, 42:20, 43:1, 43:2, 43:7, 43:10, 43:14, 43:16, 43:17, 43:21, 43:23, 43:25, 44:9, 44:12, 44:16, 44:20, 47:20, 47:25, 54:4, 54:8, 56:16, 56:25
**software** [1] - 39:22
**sold** [4] - 33:13, 38:17, 38:21, 54:11
**solution** [1] - 54:7
**solve** [2] - 7:11, 9:20
**solved** [1] - 35:25
**sort** [3] - 24:25, 37:11, 39:6
**sought** [1] - 38:22
**Soule** [2] - 1:23, 59:11
**SP** [1] - 47:12
**space** [3] - 51:14, 51:19, 51:22
**specialty** [49] - 7:7, 7:9, 7:18, 8:4, 8:9, 8:10, 8:11, 8:14, 9:4, 9:5, 9:7, 10:22, 10:24, 11:14, 12:5, 13:3, 15:15, 16:19, 17:12, 17:17, 17:18, 17:20, 26:13, 26:14, 26:17, 26:22, 27:10, 27:11, 33:5, 34:8, 34:15, 38:9, 41:6, 46:15, 46:22, 46:23, 48:5, 48:9, 48:13, 49:3, 50:2, 53:22, 54:19, 56:9, 56:12, 56:16, 56:17, 56:19, 56:21
**specifically** [4] - 12:24, 14:23, 30:19, 46:4
**specifications** [1] - 44:17
**speculation** [1] - 35:1
**spend** [1] - 25:23
**spring** [1] - 49:25
**Stamp** [1] - 42:17
**stamp** [1] - 42:17
**stand** [2] - 6:8, 37:18
**standard** [1] - 53:9

**start** [5] - 19:7, 26:10, 38:6, 46:18, 49:25
**started** [3] - 3:7, 12:6, 13:19, 15:9, 28:21, 28:24, 31:6, 40:12
**starting** [2] - 37:19, 39:7
**starts** [1] - 10:6
**state** [5] - 5:21, 38:14
**statement** [1] - 49:10
**statements** [1] - 48:13
**states** [3] - 19:13, 42:19, 55:23
**States** [2] - 3:2, 53:14
**STATES** [2] - 1:1, 1:12
**status** [1] - 16:13
**statutorily** [1] - 14:9
**stay** [1] - 35:7
**steady** [1] - 33:3
**stenography** [1] - 1:25
**Stephen** [1] - 4:13
**STEPHEN** [1] - 2:11
**still** [6] - 13:24, 13:25, 20:11, 21:18, 39:17, 44:10
**stock** [2] - 10:23, 12:8
**stocking** [1] - 13:14
**STOCKTON** [1] - 2:15
**stopped** [2] - 42:5, 42:20
**story** [2] - 46:19, 54:5
**strategy** [1] - 42:18
**Street** [4] - 1:10, 1:19, 2:9, 2:18
**strip** [1] - 41:12
**strongly** [1] - 40:15
**struck** [1] - 32:20
**stuff** [1] - 31:6
**subcutaneous** [10] - 10:19, 23:10, 24:6, 24:8, 24:18, 44:15, 51:9, 51:21, 52:8, 52:10
**subcutaneously** [3] - 29:18, 31:1, 39:24
**submit** [1] - 57:23
**submitted** [3] - 32:2, 42:16, 43:4
**subQ** [8] - 23:13, 23:14, 23:15, 24:15, 24:24, 24:25, 25:3, 25:4
**substantial** [1] - 55:15
**substitute** [5] - 10:11, 23:25, 24:2, 24:14, 24:20
**substitutes** [1] - 23:25
**substitution** [3] - 10:9, 10:20, 36:9
**succeed** [2] - 12:19,

15:20
**success** [1] - 16:1
**such-and-such** [1] - 28:6
**sudden** [2] - 12:7, 36:15
**sued** [1] - 13:16
**suffering** [2] - 16:2, 36:10
**suggest** [1] - 38:17
**suggesting** [1] - 43:13
**suggestion** [1] - 45:1
**Suite** [2] - 2:13, 2:18
**SULLIVAN** [1] - 2:2
**supplier** [1] - 11:15
**suppliers** [2] - 13:20, 13:21
**supply** [15] - 6:16, 6:19, 6:21, 7:8, 10:17, 10:21, 17:16, 31:21, 33:3, 33:9, 36:13, 38:10, 38:11, 42:2, 48:6
**supplying** [1] - 8:12
**support** [1] - 57:6
**supported** [1] - 34:17
**supports** [2] - 31:17, 40:15
**supposedly** [1] - 56:8
**suspended** [1] - 55:18
**suspenders** [1] - 32:23
**switch** [1] - 15:16
**switching** [2] - 23:11, 23:13
**system** [3] - 25:21, 30:2, 31:2

**T**

**table** [2] - 4:2, 35:18
**tacked** [1] - 18:18
**tactics** [1] - 56:9
**talks** [2] - 47:12, 48:3
**teasing** [1] - 3:24
**technologically** [1] - 5:9
**technologies** [1] - 32:24
**technology** [2] - 30:20, 44:17
**Ten** [1] - 57:18
**ten** [1] - 53:21
**tentative** [1] - 29:19
**term** [1] - 35:24
**terms** [4] - 33:18, 35:21, 37:20, 45:2
**test** [2] - 11:3, 33:11
**testified** [6] - 20:3, 23:12, 23:13, 41:3,

56:14, 56:19
**testimony** [5] - 20:2, 23:11, 35:3, 50:4, 54:1
**text** [1] - 3:20
**THE** [102] - 1:1, 1:12, 3:4, 3:9, 3:13, 3:17, 4:5, 4:17, 4:23, 5:2, 5:5, 5:11, 5:20, 5:24, 6:1, 6:4, 6:7, 6:15, 6:21, 6:24, 7:2, 7:6, 7:13, 7:15, 7:20, 7:23, 8:14, 8:23, 8:25, 9:3, 9:13, 9:15, 9:24, 10:13, 11:20, 11:23, 11:25, 12:20, 13:24, 14:14, 14:16, 15:21, 15:24, 16:13, 16:17, 16:25, 17:2, 17:6, 17:10, 17:22, 17:24, 18:6, 18:25, 19:6, 19:10, 19:16, 20:1, 20:10, 20:18, 21:1, 21:7, 22:8, 22:13, 27:24, 28:1, 28:2, 28:3, 28:11, 28:14, 28:16, 28:19, 28:23, 29:4, 29:11, 30:6, 30:22, 31:20, 32:14, 33:21, 34:18, 35:8, 36:23, 39:10, 39:14, 40:7, 41:19, 41:21, 45:16, 45:19, 45:23, 47:19, 52:4, 55:1, 55:3, 55:7, 57:12, 57:18, 57:21, 57:24, 58:1, 58:3, 58:6
**themselves** [2] - 21:10, 52:15
**theory** [1] - 10:24
**Therapeutics** [13] - 2:10, 2:14, 4:12, 28:25, 30:3, 31:13, 33:20, 40:17, 42:2, 42:9, 43:24, 44:11, 56:25
**THERAPEUTICS** [1] - 1:6
**Therapeutics'** [1] - 56:18
**therefore** [1] - 23:9
**they've** [8] - 8:4, 25:1, 34:15, 35:9, 38:14, 38:20, 52:14, 53:22
**thinking** [1] - 31:20
**third** [6] - 12:1, 14:1, 14:21, 30:3, 57:9
**third-party** [1] - 14:21
**THOMAS** [1] - 2:3

**Thomas** [1] - 4:3
**Thompson** [1] - 4:8
**threat** [1] - 19:23
**threatened** [1] - 34:16
**threatening** [2] - 21:14, 26:20
**threats** [1] - 56:15
**three** [10] - 19:3, 22:4, 22:5, 22:11, 29:19, 40:3, 42:16, 44:2, 55:25, 57:21
**three-and-a-half** [1] - 40:3
**thrilled** [1] - 51:19
**throwaway** [1] - 18:18
**ticking** [1] - 27:21
**timeline** [5] - 46:10, 49:6, 49:8, 49:11, 55:13
**timelines** [1] - 54:16
**tipping** [2] - 11:13, 11:16
**today** [26] - 4:8, 4:13, 4:19, 5:16, 6:8, 9:19, 13:22, 14:3, 18:11, 22:3, 27:4, 27:20, 31:8, 31:12, 39:5, 42:8, 45:9, 45:22, 52:7, 52:8, 52:10, 52:18, 54:13, 54:14, 54:17, 58:4
**together** [1] - 51:2
**tolerate** [1] - 22:20
**took** [2] - 15:21, 44:6
**top** [1] - 43:11
**topic** [2] - 30:16, 35:7
**touch** [2] - 30:24, 37:14
**TOWNSEND** [1] - 2:15
**track** [2] - 5:1, 15:21
**transcend** [1] - 7:2
**transcript** [2] - 1:25, 59:4
**transcription** [1] - 1:25
**treated** [2] - 22:10, 23:23
**treatment** [5] - 20:25, 21:5, 22:2, 22:3, 22:24
**treatments** [1] - 20:20
**treprostinil** [4] - 16:24, 46:9, 47:7, 49:4
**tried** [3] - 32:18, 33:11, 44:13
**true** [4] - 27:6, 27:7, 43:2, 54:3
**trust** [2] - 34:9, 34:10
**try** [6] - 13:16, 39:18,

44:1, 48:8, 49:25, 51:24
**trying** [5] - 25:19, 25:20, 28:21, 32:12, 41:24
**Tuesday** [1] - 1:10
**turn** [3] - 8:1, 19:12, 41:17
**turned** [1] - 44:19
**Twelfth** [1] - 2:9
**two** [17] - 3:9, 3:13, 4:9, 6:17, 8:21, 21:18, 32:7, 32:10, 33:11, 34:24, 35:13, 44:2, 46:3, 53:12, 53:13, 57:3
**type** [2] - 22:15, 43:15

**U**

**U.S** [1] - 1:9
**ultimately** [5] - 28:5, 35:20, 38:5, 38:24, 49:17
**unable** [4] - 10:18, 22:3, 33:12
**unavailable** [3] - 15:2, 53:2, 57:20
**uncertain** [1] - 33:18
**unclean** [1] - 14:17
**under** [2] - 17:3, 18:16
**undershot** [1] - 32:5
**understood** [2] - 13:7, 30:22
**undisputable** [1] - 18:21
**undisputed** [5] - 30:5, 35:15, 48:1, 49:6, 56:11
**unencumbered** [1] - 16:22
**unenforceable** [1] - 52:16
**unique** [1] - 18:14
**UNITED** [3] - 1:1, 1:6, 1:12
**United** [16] - 2:10, 2:14, 3:2, 4:12, 28:25, 30:3, 31:12, 33:20, 40:17, 42:2, 42:8, 43:24, 44:11, 53:14, 56:18, 56:25
**unlawful** [1] - 11:2
**unless** [1] - 35:7
**unlikely** [1] - 22:7
**untreated** [2] - 22:7, 24:4
**up** [12] - 11:15, 27:25, 28:8, 35:8, 37:18, 38:5, 44:24, 47:17,

49:8, 49:14, 54:9, 54:13
**upfront** [1] - 31:13
**upset** [1] - 36:12
**urge** [1] - 45:13
**URQUHART** [1] - 2:2
**users** [2] - 48:25, 49:2
**uses** [1] - 11:19
**UT** [3] - 13:16, 27:17, 42:20
**UTC** [28] - 17:17, 17:19, 17:21, 17:23, 17:24, 18:3, 18:4, 20:3, 21:13, 21:21, 22:17, 23:12, 26:21, 48:8, 48:23, 48:24, 48:25, 50:17, 50:21, 50:25, 51:1, 51:19, 52:10, 53:19, 54:9, 54:14
**UTC's** [2] - 19:12, 51:5
**UTC-developed** [1] - 50:25

**V**

**value** [1] - 54:10
**variety** [1] - 34:20
**various** [1] - 40:18
**venue** [1] - 3:5
**verbally** [1] - 58:4
**vials** [2] - 47:7, 55:12
**virtually** [1] - 27:5
**visibility** [2] - 38:16, 38:21

**W**

**waited** [1] - 36:2
**waiting** [1] - 35:25
**walk** [4] - 33:21, 46:4, 46:7, 46:9
**Walker** [1] - 43:5
**Walnut** [1] - 1:10
**wants** [1] - 30:24
**Washington** [2] - 2:9, 2:19
**Waxan** [4] - 14:10, 30:15, 30:16, 30:18
**ways** [2] - 20:14, 23:22
**week** [1] - 57:15
**welcome** [2] - 3:4, 45:19
**West** [1] - 1:19
**whereby** [1] - 31:10
**Whitmer** [1] - 4:19
**WHITMER** [1] - 2:18
**whole** [1] - 38:1
**wildly** [1] - 32:9

**Williams** [1] - 4:14
**WILLIAMS** [1] - 2:6
**willing** [1] - 31:15
**win** [1] - 12:16
**wind** [1] - 41:24
**withhold** [1] - 26:20
**withholding** [2] - 27:8,
  48:17
**witness** [1] - 56:15
**witnesses** [3] - 27:14,
  53:20, 56:14
**wonderful** [2] - 55:8,
  58:3
**word** [1] - 40:23
**words** [1] - 37:17
**works** [3] - 6:16,
  17:16, 22:19
**world** [10] - 16:8,
  28:21, 28:24, 29:6,
  30:6, 31:6, 39:7,
  40:12, 43:1
**worried** [3] - 25:24,
  31:21, 35:2
**worth** [1] - 43:22
**would've** [1] - 43:1
**wound** [1] - 38:5
**write** [2] - 9:24, 9:25
**written** [7] - 10:12,
  10:15, 10:22, 11:6,
  11:10, 11:18, 38:10

## Y

**Yaping** [1] - 30:11
**year** [9] - 25:8, 26:24,
  29:22, 36:13, 38:1,
  40:11, 43:9, 51:14,
  53:5
**years** [9] - 29:19,
  41:25, 42:16, 44:11,
  48:4, 53:13, 53:21,
  55:25
**yellow** [1] - 47:6
**York** [2] - 1:16, 2:5

## Z

**zero** [3] - 21:19, 34:2,
  34:10
**Zhu** [2] - 30:11